FILED
CLERK, U.S. DISTRICT COURT

08/25/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>MORRIS ROLAND GOLDMAN,<br>   aka "Morrie Goldman,"<br><br>          Defendant. | CR No.  2:20-cr-00369-PSG<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 371: Conspiracy] |

The United States Attorney charges:

                    INTRODUCTORY ALLEGATIONS

     At times relevant to this Information:

A.   BACKGROUND ON CITY PROCESSES

     1.   The City of Los Angeles (the "City") was a government that
received more than $10,000 per fiscal year in funds from the United
States, including for the year 2018, in the form of grants,
contracts, subsidies, loans, guarantees, insurance, and other forms
of federal assistance.  All legislative power in the City was vested
in the City Council and was exercised by ordinance subject to a veto
by the Mayor.  The City was divided into fifteen City Council

Districts covering different geographic areas.  The City Council was composed of fifteen members elected from single-member districts.

2.    Within the City, large-scale development projects required a series of applications and approvals prior to, during, and after construction.  These applications and approvals occurred in various City departments, including the City Council, the Planning and Land Use Management ("PLUM") Committee, the Economic Development Committee, the Los Angeles Planning Department, the Los Angeles Department of Building and Safety, the Area Planning Commission, the City Planning Commission ("CPC"), and the Mayor's Office.

3.    Each part of the City approval process required official actions by public officials.  These included entitlements, variances, general plan amendments, subsidies, incentives, public benefits, scheduling agendas for the various committees, and overall approvals.

4.    Even for projects that were not going through the City approval process, City officials could benefit a project or take adverse action against a project by advocating for or against the project, including by pressuring or seeking to influence other City officials, departments, business owners, and stakeholders.

5.    Developers typically hired consultants and/or lobbyists to assist in guiding projects through the development process and City departments, including by interfacing with the City Council office that represented the district in which the project was located.

6.    Under the California Political Reform Act, every elected official and public employee who made or influenced governmental decisions was required to submit a Statement of Economic Interest, also known as the Form 700, annually.

2

7.    To prevent former City officials from exercising or appearing to exercise improper influence over City decisions, the Los Angeles Municipal Code contained "revolving door" restrictions.  The restrictions imposed a lifetime ban on receiving compensation to attempt to influence City action on a specific matter in which the City official personally and substantially participated in during their City service.  The restrictions also imposed a one-year ban, or "cooling-off" period, during which the City official was prohibited from attempting to influence action on a matter pending before the City official's former City agency for compensation.

B.    RELEVANT PERSONS AND ENTITIES

8.    Defendant MORRIS ROLAND GOLDMAN, also known as "Morrie Goldman," was a consultant for real estate developers with projects in the City, including for Company M.  Defendant GOLDMAN was also a major fundraiser for Jose Huizar.  Defendant GOLDMAN was a principal officer of a political action committee ("PAC"), PAC A.

9.    Jose Huizar was the Councilmember for Council District 14 ("CD-14"), first elected in 2005, and re-elected in 2007, 2011, and 2015.  Huizar was the Chair of the PLUM Committee.  Huizar also served on the Economic Development Committee.  As a public official employed by the City, Huizar owed a fiduciary duty to the City and citizens of the City to perform the duties and responsibilities of Huizar's office free from bias, conflicts of interest, self-enrichment, self-dealing, concealment, deceit, fraud, kickbacks, and bribery.

10.   Huizar Associate 2 was a close associate and fundraiser for Huizar, who created and operated PAC B, which at times was used to benefit Huizar's political causes.

3

11.   Huizar Associate 3 was a close associate of and fundraiser for Huizar and operated a company in the City.

12.   George Esparza worked for the City as Huizar's Special Assistant in CD-14 until on or about December 31, 2017.

13.   City Staffer A-2 worked for the City on Huizar's staff in CD-14.

14.   Company M was a domestic real estate development company that owned multiple development projects nationwide and located in the City, including Project M located in CD-14.  Project M was a mixed-use development that was to include 125,000 square feet of commercial retail and office floor area and approximately 475 live/work dwelling units.  Executive M was a principal partner of Company M representing Los Angeles.

C.   DEFENDANT GOLDMAN'S ROLE IN PAC A

15.   Beginning no later than June 2016, Huizar and others planned to have Relative A-1, Huizar's relative, succeed him as Councilmember for CD-14 in order to maintain a political stronghold in the City.  In furtherance of this plan, defendant GOLDMAN, Huizar, Esparza, and others established PAC A, which was registered as a "general purpose" PAC that purported to benefit a broad array of candidates and causes but was, in fact, primarily intended to benefit Relative A-1's campaign.  Huizar, on numerous occasions, expressed to defendant GOLDMAN that it was important to accumulate a significant amount of financial contributions early on in order to scare off potential candidates contemplating running against Relative A-1.  At Huizar's request and direction, defendant GOLDMAN thereafter solicited and pressured real estate developers with projects pending before the City to contribute to PAC A in exchange for favorable

treatment of their projects by Huizar and the City, including in the
PLUM Committee, Economic Development Committee, and City Council.

16. On May 2, 2017, in a telephone call, defendant GOLDMAN and
Esparza discussed the strategy to use political action committees to
financially benefit Relative A-1's campaign.  Specifically, defendant
GOLDMAN requested a dinner with Huizar to "talk about some political
[contribution] stuff" and the "committee he wants to open."
Defendant GOLDMAN told Esparza that Huizar Associate 3 and defendant
GOLDMAN wanted to talk to Huizar about "some ideas on what to do"
with the PAC "[Huizar] wants to do for [Relative A-1]."  Defendant
GOLDMAN and Esparza then discussed that Huizar no longer wanted to
use PAC B with Huizar Associate 2 but instead wanted his own PAC.
Defendant GOLDMAN then stated: "we have some ideas on how to
structure it and we wanna talk to him about it."

17. On May 18, 2017, defendant GOLDMAN and Esparza continued
discussing establishing a PAC to benefit Relative A-1's campaign.
Specifically, defendant GOLDMAN told Esparza: "you and I can run [the
PAC]. But we need to have someone who can be the face of it."
Defendant GOLDMAN stated: "I would envision Jose [Huizar], saying,
'Let's have ten people at ten thousand bucks each.'  You know, once
or twice a year.... And then in three years [closer to the CD-14
election] ... you're talking, you know, almost a million dollars."
Defendant GOLDMAN reiterated that they needed "someone who can just
sort of be the face of it, so that it's not you or me.... And then
you and I can run it."  Defendant GOLDMAN explained: "[Relative A-1]
gets the lion's share of [the PAC expenditures] and Jose [Huizar]
would do the lion's share of the fundraising, but it's not just Jose
[Huizar] for [Relative A-1]."  Defendant GOLDMAN then told Esparza he

1   had people ready to start contributing now.  During the same phone

2   call about political contributions to help Huizar and Relative A-1,

3   defendant GOLDMAN emphasized to Esparza that he needed help from the

4   City, specifically the City's digital sign ordinance "to move on the

5   30th" because it would affect one of his developer clients, adding:

6   "I like this client. They pay me a lot of money."

7        18.  On May 22, 2017, in a telephone call, defendant GOLDMAN and

8   Esparza discussed an upcoming meeting with Huizar for one of

9   defendant GOLDMAN's developer clients.  Defendant GOLDMAN noted:

10  "It's a relationship thing, it's very consistent with sort of the,

11  the long-term MORRIE [GOLDMAN], George [Esparza], Jose [Huizar]

12  plan."

13       19.  On May 25, 2017, in a telephone call, defendant GOLDMAN

14  told Esparza: "I talked to Jose [Huizar] yesterday and so we're green

15  lighted," referring to the idea of establishing a PAC to benefit

16  Relative A-1.  Defendant GOLDMAN then told Esparza "we need to find

17  somebody in the district, a very good close either family friend or

18  relative" to serve in the role of "treasurer or the controlling

19  person, you know, on paper."  Esparza responded: "So I'll ask

20  [Huizar] too who he may have in mind, okay."

21       20.  On June 2, 2017, in a telephone call, defendant GOLDMAN,

22  Huizar, and Relative A-1 discussed establishing a PAC to support

23  Relative A-1's campaign.  Defendant GOLDMAN explained: "the PAC ...

24  that's going to be strictly political money and, you know, two years

25  from now, or three years, there'll be a million dollars in there. You

26  won't be able to direct it, but there'll be people, you know, [who]

27  are like minded."

28

21.  On or around June 22, 2017, defendant GOLDMAN met with Huizar, Esparza, and Justin Kim and discussed establishing a PAC to raise money for Relative A-1's campaign.  During this meeting, Huizar suggested having Kim find an associate to serve as the "face" of the PAC to disguise Huizar's involvement and the PAC's connection to CD-14.

22.  On June 22, 2017, in a telephone call, defendant GOLDMAN and Huizar discussed the PAC to benefit Relative A-1's campaign, specifically the need to install someone to run the PAC that Huizar would be able to covertly control or influence.  Defendant GOLDMAN stated that regarding the treasurer for the PAC, "I just really want to again encourage you to think about someone from your personal circle."  Huizar responded: "Yeah, no, I agreed to that, you made a very good point which is, look if I go with somebody that Justin [Kim] recommends, I thought it was cool [be]cause it's more distance from me, right? Some Korean. Who's gonna know some Korean, some random Korean? 'What are they doing fundraising over here? It must be an independent assistant ... from Huizar.'.... But, the more I thought about it, I think there's a lot more benefit to have someone who's close to me, because you're right, what if like, Justin [Kim] and I have a falling out and there's a million dollars standing in committee. I'm supposed to have not anything to do with it, supposedly I don't have anything to do with it, so."  Defendant GOLDMAN responded: "I mean, in an ideal world, I mean, we're all friends, we're all loyal, but you know, things happen. I just want to make sure you're protected."  Defendant GOLDMAN and Huizar then discussed asking one of defendant GOLDMAN's developer clients for "seed money" for the PAC.  Defendant GOLDMAN stated: "he's my client,

but you're my friend. And we have an end game."  Defendant GOLDMAN
and Huizar agreed to "seed the PAC early."

23.  In the subsequent months, defendant GOLDMAN and Huizar had
regular discussions regarding their strategy for opening PAC A and
targeting developers with projects pending before the City to
contribute to Relative A-1's campaign.

24.  On October 18, 2017, a political account supervisor sent an
initial Statement of Organization for PAC A to the California
Secretary of State by U.S. Mail.  Defendant GOLDMAN was listed as an
"additional principal officer" of the PAC.

25.  Beginning in or around April 2018, defendant GOLDMAN,
Huizar, and Huizar Associate 3 met regularly to discuss the
fundraising plan for Relative A-1's campaign.  Specifically, on March
26, 2018, Huizar sent a text message to defendant GOLDMAN, writing:
"We should meet every two weeks to discuss progress on pac. Me, u,
and [Huizar Associate 3]. What u think? Can I have [a CD-14 staffer]
set something up?"  On March 29, 2018, Huizar instructed his staffer
in an e-mail: "please schedule a meeting with me and MORRIE [GOLDMAN]
and [Huizar Associate 3] a meeting every two weeks to go over 'PAC'.
[T]hey will know what that's about."

26.  During their regular meetings to discuss the PACs, among
other things, Huizar, defendant GOLDMAN, and Huizar Associate 3
created and discussed a document titled "Fundraising Plan," which
tracked developers, contribution amounts, and the designated person
responsible for soliciting the contributions, which included Huizar,
defendant GOLDMAN, and Huizar Associate 3, among others.  The
"Fundraising Plan" document included a section titled "MORRIE" for

tracking contributions to PAC A, and a separate section titled "[Huizar Associate 2]" for tracking contributions to PAC B.

27.   On April 4, 2018, as an example of Huizar's regular requests for accounting of PAC A, Huizar sent an e-mail to defendant GOLDMAN and Huizar Associate 3, writing: "Good meeting yesterday. (1). MORRIE [GOLDMAN], Please have accounting of PAC [A] for the next time we meet. My records show there are about 55 k in account. Please bring all income and what expenses we have had to date."

28.   On April 13, 2018, Huizar sent an e-mail to defendant GOLDMAN, writing: "Hey MORRIE [GOLDMAN]. Attached is fundraising plan I have. See you Monday. I was gonna propose that you and I just meet on this plan in future and we can just nudge [Huizar Associate 3] to collect. He just has 2 (although large) targets to collect."  The attachment titled "[PAC A]" included a list of developers and individuals, amounts, notes, and the individual responsible for soliciting the contribution.  Defendant GOLDMAN had eight targets for contributions totaling $275,000, including developers with projects pending before the City and Huizar.  Huizar had twelve targets totaling $680,000, and Huizar Associate 3 had two targets totaling $200,000.  In total, the fundraising plan had $1,155,000 in targeted contributions for PAC A to benefit Relative A-1's campaign.

D.   HUIZAR'S SUPPORT FOR PROJECT M AND CONTRIBUTIONS TO PAC B

29.   On August 18, 2016, Huizar met with defendant GOLDMAN and Executive M at Huizar's City Hall office to discuss Project M.  At the meeting, defendant GOLDMAN and Executive M asked Huizar to file a motion to initiate a General Plan Amendment for Project M.  Huizar agreed to initiate the General Plan Amendment, either by exerting pressure on the Planning Department to do so or by filing a motion.

30.   On or about August 26, 2016, Huizar and his staff urged the Planning Department to approve the General Plan Amendment initiation for Project M, which the Planning Department did.

31.   Thereafter, Huizar, Esparza, defendant GOLDMAN, and Company M agreed to commit a series of actions that proved that Company M, through defendant GOLDMAN and Executive M, could be trusted to engage in an explicitly corrupt relationship with Huizar and Esparza.

**Company M's First $25,000 Contribution to PAC B**

32.   In September 2016, less than a month after Huizar had provided significant assistance to Company M and Executive M, Huizar asked defendant GOLDMAN for contributions to PAC B from defendant GOLDMAN's clients with projects pending in CD-14, including from Executive M on behalf of Company M, in connection with a City homelessness initiative that was on the ballot in November 2016 (Measure HHH).   Defendant GOLDMAN agreed to convey the requests to his clients.

33.   On October 10, 2016, Huizar and defendant GOLDMAN spoke about Company M and another developer making contributions to Huizar Associate 2's account.   Huizar later directed Esparza and another CD-14 staffer to "Work with [defendant GOLDMAN] to get them in.  Get [defendant GOLDMAN] the [Huizar Associate 2] acco[u]nt name and number etc."

34.   On October 13, 2016, defendant GOLDMAN sent an e-mail to Executive M, passing on the information for PAC B he received from Esparza.   Executive M replied: "Timing and amount?"   Defendant GOLDMAN wrote: "25K as soon as possible."   The next day, defendant GOLDMAN sent an e-mail to Executive M, attaching a remit form for PAC B, and writing: "Huizar is asking that contributions be directed to

this committee. Please hold off if you are processing a contribution to the other primary committee."

35.  On October 26, 2016, Executive M wrote to defendant GOLDMAN in a text message about the $25,000 PAC B contributions: "I should have checks by tomorrow .... Would it be worth setting up a quick drink or coffee with Jose [Huizar] when we deliver? Could be good to talk big picture, etc."  The next day, Company M sent three checks from three separate entities, payable to PAC B in the amount of $8,333.33 for a total of $25,000, by U.S. Mail to the Company M office in Los Angeles, California.

36.  On October 31, 2016, defendant GOLDMAN sent a text message to Esparza, writing: "When can I get [Executive M] in with Jose [Huizar] to deliver the checks?"

**Company M's Additional $25,000 Contribution to PAC B**

37.  On February 15, 2017, Huizar met defendant GOLDMAN for lunch in downtown Los Angeles to discuss various projects.  At the lunch, Huizar asked defendant GOLDMAN for an additional $25,000 contribution to PAC B from Company M, in connection with a County homelessness initiative that was on the ballot in March 2017 (Measure H).  Defendant GOLDMAN agreed to convey the request to Executive M.

38.  On February 21, 2017, defendant GOLDMAN informed Esparza via text message that Executive M "acknowledged the conversation with Jose [Huizar]" regarding Company M's additional contribution to PAC B.  Approximately nine days later, on or about March 2, 2017, Company M sent a check for $25,000 made payable to PAC B by U.S. Mail to PAC B in Sacramento, California.

1

2

**Huizar Expresses Gratitude for Defendant GOLDMAN Staying Silent When Questioned About Donations**

3      39.  On May 5, 2017, in a telephone call, Huizar and defendant

4  GOLDMAN discussed Company M's contribution to PAC B.  Huizar and

5  defendant GOLDMAN found out that PAC B publicly disclosed Company M

6  as a top donor for a Los Angeles City Council candidate.  Defendant

7  GOLDMAN told Huizar that a reporter was "asking who asked us for the

8  donation, but we, we're not gonna respond to that."  Huizar

9  responded: "Thank you very much. I appreciate that."  Defendant

10  GOLDMAN stated: "No of course."  Defendant GOLDMAN then stated: "When

11  I told George [Esparza], I said, look, my two things that I gotta

12  protect you know ... [Company M] and gotta protect you."  Huizar

13  stated "we can't be sloppy about this and trust, uh, [Huizar

14  Associate 2], but, anyway, we will save that conversation for

15  tomorrow, ok?"

16      40.  On May 9, 2017, Executive M sent an e-mail to defendant

17  GOLDMAN asking about the media inquiry regarding the Company M

18  campaign contribution to PAC B in support of a Los Angeles City

19  Council candidate.  Defendant GOLDMAN responded by e-mail, reminding

20  Executive M that the PAC B contribution "was an 'ask' from Jose

21  Huizar."

22      **Company M Seeks Reduced Affordable Housing Requirement**

23      41.  In or around January 2018, Huizar spoke with defendant

24  GOLDMAN regarding Project M's approval in the PLUM Committee and City

25  Council.  Specifically, they discussed that Company M wanted the City

26  to approve Project M with a 5% affordable housing requirement, while

27  Huizar initially insisted on 11% affordable housing.  Defendant

28  GOLDMAN told Huizar that Executive M was concerned he would suffer

significant professional consequences, including the loss of his job with Company M, if Project M was not approved, and that if Project M did not obtain its preferred affordable housing requirements it would threaten the viability of the project altogether.

42.   These Introductory Allegations are incorporated by reference into the sole count of this Information.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT ONE

[18 U.S.C. § 371]

A.   OBJECTS OF THE CONSPIRACY

43.   Beginning on an unknown date but no later than January 8, 2018, and continuing until in or about November 2018, in Los Angeles County, within the Central District of California, and elsewhere, defendant GOLDMAN, acting as an agent of and for the benefit of Company M, Huizar, and Executive M, acting on behalf of and for the benefit of Company M, together with others known and unknown to the United States Attorney, knowingly combined, conspired, and agreed with each other to knowingly and intentionally commit offenses against the United States, namely: (1) Bribery Concerning Programs Receiving Federal Funds, in violation of Title 18, United States Code, Section 666; and (2) Honest Services Fraud, in violation of Title 18, United States Code, Sections 1341 and 1346.

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

44.   The objects of the conspiracy were to be accomplished, in substance, as follows:

a.   In exchange for his intending to be influenced and rewarded in connection with Project M, Huizar would demand, solicit, accept, and agree to accept various things of value, including financial benefits and political contributions, from developers, including Executive M, Company M, and their proxies, including defendant GOLDMAN.

b.   Defendant GOLDMAN would convey Huizar's demands, requests, and solicitations for financial benefits in exchange for Huizar's official acts to Executive M and Company M.

14

c.   Defendant GOLDMAN would convey Executive M's and Company M's agreement to provide financial benefits in exchange for Huizar's official acts to Huizar.

d.   In exchange for the things of value from Executive M and Company M facilitated by defendant GOLDMAN, Huizar would agree to perform and perform the following types of official acts, among others: (1) voting in favor of Project M in the PLUM Committee and City Council; and (2) exerting pressure on other City officials to influence the approval process of Project M.

e.   Defendant GOLDMAN, Huizar, Executive M, and Company M would conceal from the City that Company M agreed to provide things of value to Huizar, including financial benefits, in exchange for Huizar intending to be influenced and rewarded in connection with Project M and his official acts.

C.   OVERT ACTS

45.   In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, on or about the following dates, defendant GOLDMAN, Huizar, Executive M, Company M, and others known and unknown to the United States Attorney, committed various overt acts in Los Angeles County, within the Central District of California, and elsewhere, including, but not limited to, the following:

**Company M's $25,000 Contribution and Additional $25,000 Commitment to PAC A**

Overt Act No. 1:   On January 8, 2018, Huizar and defendant GOLDMAN had a discussion via text message regarding Project M and Company M's willingness to contribute to their newly established PAC, PAC A.  Specifically, Huizar wrote: "Let's do the pac stuff later this week. See u there at 6. What's purpose of tonight's meeting? Are

they [Company M] gonna help with pac?"  Defendant GOLDMAN replied:

"[Executive M] wants to talk about their [Project M] and see if

you're comfortable with the height and affordability levels."  Huizar

answered: "Are they gonna help with pac?"  Defendant GOLDMAN replied:

"I'm sure they will, however - as your friend - let's discuss this in

a different text thread" in order to avoid documenting Huizar's

conditioning his official assistance with Project M on Company M's

financial support for PAC A.

Overt Act No. 2:   On February 23, 2018, Huizar and defendant

GOLDMAN had a discussion via text message regarding PAC A.

Specifically, defendant GOLDMAN wrote: "Are you checking the Confide

App for texting on your iPhone?"  Defendant GOLDMAN further wrote: "I

was going to text you about your meeting with [PAC A's attorney].

Wanted to see if we got any clarification. Confide is good for

texting because it is like Snap Chat...message disappears."

Overt Act No. 3:   On March 1, 2018, Huizar met with defendant

GOLDMAN and discussed Company M's contributions to PAC A.

Specifically, Huizar asked for a $50,000 contribution to PAC A to be

paid in two installments, $25,000 as soon as possible and another

$25,000 by the end of the year, after Project M was approved.

Defendant GOLDMAN agreed to convey the request to Executive M.

Overt Act No. 4:   On March 14, 2018, defendant GOLDMAN met

with Executive M and relayed Huizar's request to have Company M

contribute $50,000 to PAC A, which defendant GOLDMAN explained was

designed to benefit Relative A-1's campaign for the CD-14 seat.

Executive M agreed.

Overt Act No. 5:   On March 14, 2018, at approximately 4:00

p.m., Huizar met with defendant GOLDMAN to discuss PAC A, including

16

1  the fact that Executive M agreed to have Company M contribute to PAC
2  A.

3      Overt Act No. 6:    On March 15, 2018, defendant GOLDMAN sent an
4  e-mail to Executive M with the subject line "[PAC A]," writing: "this
5  is the committee we previously discussed," and attaching a
6  contribution form for PAC A.

7      Overt Act No. 7:    On March 26, 2018, Huizar sent an e-mail to
8  himself, attaching a document titled "Fundraising Plan."  The
9  document included, among other things, company and individual names,
10 contribution amounts, and the person responsible for soliciting
11 contributions to PAC A and PAC B.  Under the PAC A section, the
12 document included an entry for Company M for $50,000, and listing
13 defendant GOLDMAN.

14     Overt Act No. 8:    On April 13, 2018, Huizar sent an e-mail to
15 defendant GOLDMAN, attaching a document titled "[PAC A]" that
16 included, among other things, an entry for Company M for $50,000,
17 with the note: "B/4 June. 2 checks. 2 Entities."

18     Overt Act No. 9:    On May 8, 2018, Executive M and defendant
19 GOLDMAN had a discussion via text message regarding a meeting with
20 the Planning Department scheduled for the same day for Project M.
21 Specifically, Executive M wrote: "Very important that [City Staffer
22 A-2] calls [a Planning Department official] letting them know he
23 supports the height etc. please please make sure this happens prior."
24 Defendant GOLDMAN later wrote: "[City Staffer A-2] will let them know
25 their position, and then make the changes in PLUM."  Executive M
26 later wrote: "This would be a disaster if they took a position to
27 deny[.] This meeting seems to be a really bad idea now. When does
28 Jose [Huizar] get back?"  Defendant GOLDMAN responded: "Spoke with

[City Staffer A-2]. He will speak with [the Planning Department official], and then call me to report back prior to our meeting."

Overt Act No. 10:   On May 8, 2018, Huizar caused City Staffer A-2 to advocate CD-14's position and encourage a Planning Department official to approve Project M to allow the project to proceed to a hearing before the City Planning Commission.

Overt Act No. 11:   On May 22, 2018, Executive M received an e-mail from Employee M, a Company M employee, sent to the CEO, with the subject "[PAC A]," seeking approval for a $25,000 check to PAC A, noting: "We have discussed this in the past."

Overt Act No. 12:   On or about June 13, 2018, at Huizar's direction, Company M sent two checks from two separate entities, each made payable to PAC A, in the amount of $12,500 each for a total of $25,000, by U.S. Mail to the Company M office in Los Angeles, California, around the same time that the City Planning Commission approved Project M, allowing it to move forward to a hearing before the PLUM Committee and ultimately City Council.

**Company M's Additional $50,000 Commitment to PAC A in Exchange for Huizar's Help on Project M**

Overt Act No. 13:   On August 9, 2018, defendant GOLDMAN sent an e-mail to Executive M regarding Project M's upcoming hearing before the PLUM Committee, writing: "We need to address the Labor issue. Seriously...we need to take [the executive of a labor union] off the chess board."  Defendant GOLDMAN and Executive M believed the labor union was an issue that could affect Project M's approval in the PLUM Committee with the potential to create delays, increase costs, threaten the viability of Project M, resulting in negative

1    repercussions for Executive M personally, including the potential

2    loss of his job.

3        Overt Act No. 14:   On September 4, 2018, in an e-mail,

4    Executive M asked defendant GOLDMAN: "Any updates on Huizar meeting?"

5    Defendant GOLDMAN responded: "I'm having a one-on-one meeting with

6    [Huizar], and you're #1 on the agenda."

7        Overt Act No. 15:   On September 4, 2018, Huizar met with

8    defendant GOLDMAN regarding the labor union issue Company M was

9    facing on Project M.  During the meeting, defendant GOLDMAN requested

10   on behalf of Executive M for Huizar to vote against the labor union's

11   appeal by approving Project M in the PLUM Committee.  Huizar

12   explained that voting against the labor union, which he considered an

13   ally, could have negative ramifications on Relative A-1's campaign.

14   Because of this risk, Huizar told defendant GOLDMAN that if he were

15   to vote against the labor union in the PLUM Committee, then Company M

16   would have to make it worthwhile, which defendant GOLDMAN understood

17   to mean that Huizar expected a financial benefit from Company M in

18   exchange for his efforts with the labor union.

19       Overt Act No. 16:   On September 6, 2018, defendant GOLDMAN and

20   Executive M met to discuss Project M and resolving its labor issue.

21   During the meeting, defendant GOLDMAN discussed with Executive M that

22   they needed to make it worthwhile for Huizar's intervention with the

23   labor union.  Executive M and defendant GOLDMAN agreed that Company M

24   should offer to make an additional $50,000 contribution to PAC A.

25   Company M had previously agreed to contribute $50,000, and paid the

26   first installment in June 2018.  This additional $50,000 contribution

27   would bring the total agreed-upon contributions on behalf of Company

28

M to PAC A to $100,000 in exchange for Huizar's assistance with
Project M.

Overt Act No. 17:   On September 6, 2018, Huizar and defendant
GOLDMAN met outside a restaurant in Boyle Heights to discuss the new
arrangement with Executive M.  At the meeting, defendant GOLDMAN
conveyed the offer of an additional $50,000 contribution to PAC A,
bringing the total to $100,000, and Huizar agreed to accept the
contribution in exchange for voting to approve Project M over
objections by the labor union.  Huizar also requested a private
meeting with Executive M.

Overt Act No. 18:   On September 6, 2018, defendant GOLDMAN
asked Executive M via text message: "Can you do dinner with Huizar on
Tuesday, 9-25?"

Overt Act No. 19:   On September 10, 2018, in a text message,
defendant GOLDMAN asked Huizar: "Re: [Company M] & [Project M]. You
are meeting with [Executive M] on 9-25 to negotiate public benefits
package. Could we target PLUM on 10-02 with the clear understanding
that the item gets pulled from agenda with no deal? [City Staffer A-
2] is waiting for direction from you before scheduling."

Overt Act No. 20:   On September 11, 2018, in a text message,
Huizar asked defendant GOLDMAN: "Hey, let's talk about your
fundraiser for [Relative A-1] before event and who U are inviting. I
want to make sure we are hitting people up for right amount and we
are not calling same people."  Defendant GOLDMAN replied: "Of
course."  Huizar then asked: "Oct 11 still good for you?"

Overt Act No. 21:   On September 11, 2018, just after the text
messages with Huizar, defendant GOLDMAN sent a text message to
Executive M stating: "Plan on 10-02 PLUM. But let's discuss..."

1    Overt Act No. 22:   On September 12, 2018, while Huizar was
2  negotiating the additional financial benefit he sought from Executive
3  M and Company M, Huizar used his official position as PLUM Committee
4  Chair to postpone the committee's hearing on Project M to October 2,
5  2018, thereby causing the project to be delayed until after he met
6  with Executive M.

7    Overt Act No. 23:   On September 24, 2018, defendant GOLDMAN
8  told Huizar via text message: "We are meeting [Executive M] tomorrow
9  for dinner. Do you still want [a restaurant in downtown Los Angeles],
10  or would you like someplace a bit more private?"

11    Overt Act No. 24:   On September 24, 2018, defendant GOLDMAN
12  told Executive M via text message: "Meeting is moved to breakfast on
13  10-04 @ 9 AM."  Executive M replied: "But that pushes our date???
14  This is a disaster."  Defendant GOLDMAN responded: "Yes....it pushes
15  the date. It's going to get done."

16    Overt Act No. 25:   On September 26, 2018, in a text message,
17  defendant GOLDMAN asked Executive M: "any chance you can do your one
18  on one dinner with Huizar THIS Friday, 9-28?"  Executive M replied:
19  "Yes. I'm assuming hearing date is the same?"

20    Overt Act No. 26:   On September 28, 2018, Huizar and Executive
21  M met to discuss Huizar's support for Project M, its approval in the
22  PLUM Committee, and Company M's support for the PAC to benefit
23  Relative A-1's campaign.  During the same conversation, Executive M
24  offered to provide opposition research to Huizar on a young female
25  former CD-14 staffer who planned to file a lawsuit against Huizar,
26  and Huizar accepted this offer.  As part of their negotiation to help
27  Project M, Huizar and Executive M also discussed Company M hiring
28  Huizar after he left office.

1        <u>Overt Act No. 27:</u>   On September 28, 2018, Huizar sent a text

2    message to defendant GOLDMAN, writing: "Good meeting with [Executive

3    M]. He is willing to help [Relative A-1] committee. He will collect

4    from consultant/contractors. We didn't discuss amount. Please enlist

5    him for your event and ask him to collect 15-20 k for your event."

6        <u>Overt Act No. 28:</u>   On October 2, 2018, Huizar used his official

7    position as the PLUM Committee Chair to postpone his committee's

8    hearing on Project M to October 16, 2018.

9        <u>Overt Act No. 29:</u>   On October 11, 2018, Huizar, Executive M,

10   Employee M, and defendant GOLDMAN attended a fundraiser for Relative

11   A-1 hosted by defendant GOLDMAN.  At the fundraiser, Executive M

12   provided Huizar the opposition research against the young female

13   staffer he had promised as part of their agreement for Huizar to help

14   Project M.

15       <u>Overt Act No. 30:</u>   On October 13, 2018, Executive M sent a text

16   message to defendant GOLDMAN regarding the upcoming PLUM Committee

17   hearing for Project M, asking: "Anyone else on plum we should connect

18   with?"  Defendant GOLDMAN replied: "I was thinking about it but I

19   really don't want to call attention to it. I would rather let Jose

20   [Huizar] power play it through."

21       <u>Overt Act No. 31:</u>   On October 16, 2018, Huizar voted to deny

22   the union appeal and to approve Project M in the PLUM Committee,

23   including accepting certain modifications requested by Company M.

24   Specifically, the PLUM Committee accepted Company M's preferred

25   modifications to the affordable housing restrictions, thereby undoing

26   the more stringent requirements recommended by the City Planning

27   Commission.  As a result of Huizar's approval and undoing the CPC

28   recommendations, Company M obtained significant reductions to Project

M's affordable housing requirements, from 11% "Very Low Income" units to 6% "Moderate Income" units.  Specifically, Huizar's approval of Company M's modifications decreased low-income individuals' access to the project while ensuring Company M obtained an estimated $14 million in net savings.

Overt Act No. 32:  On October 16, 2018, after the PLUM Committee approval, in a text message, defendant GOLDMAN told Executive M: "Let's talk tomorrow. I'm seeing Jose [Huizar] on Thursday, so I know he will bring up follow up on a few items," referring to Company M's commitment to contribute the remaining $75,000 to PAC A.

Overt Act No. 33:  On October 18, 2018, Huizar and defendant GOLDMAN had a meeting at Huizar's residence, where Huizar raised Company M's commitment to contribute to PAC A.

Overt Act No. 34:  On October 28, 2018, defendant GOLDMAN told Executive M via text message: "I was with Jose [Huizar] on Friday night. He still wants the meeting with you, he and [the labor union] so you can shake hands in front of him. I have a request in for the meeting."

Overt Act No. 35:  On October 30, 2018, defendant GOLDMAN told Executive M via text message: "No meeting with [the labor union] is necessary. All good for tomorrow in Council on [Project M]. Jose [Huizar] is asking that in your communications with the [labor union] you let them know you're bringing them to the table because of our mutual friend. Make sense?"

Overt Act No. 36:  On October 31, 2018, the date Project M was before City Council, defendant GOLDMAN spoke to Huizar via text messages to confirm that Executive M got in touch with the labor

23

union, and Huizar specifically instructed defendant GOLDMAN: "Get in touch with [the labor union] right away please. It has other implications. Thank u."

Overt Act No. 37:   On October 31, 2018, shortly before the City Council vote, defendant GOLDMAN spoke to Executive M via text messages regarding Huizar's request to get in touch with the labor union and confirmed that Executive M spoke to a labor union representative.

Overt Act No. 38:   On October 31, 2018, Huizar voted to approve Project M in City Council.

Overt Act No. 39:   On October 31, 2018, Executive M wrote an e-mail to the owners of Company M and other employees, writing: "Great news, we just received final unanimous approval for [Project M] by city council.  Although today is bit of a formality (PLUM is where the discretion usually happens), this is the final step."  Executive M highlighted the benefits Company M was able to secure in PLUM from Huizar, writing: "our obligations related to rent [affordable housing] restrictions and union involvement are minimal compared to other future projects in the area."  Executive M also touted "the entitlement of the tallest building in the arts district by 3 times (35 stories) in a wealthy opinionated hipster community" as a "truly amazing" accomplishment.

Overt Act No. 40:   On or around October 31, 2018, defendant GOLDMAN updated a document tracking commitments and contributions made to PAC A.  Among other things, the document had an entry for Company M with the figure $25,000 in the column titled "Paid," and $75,000 in the column titled "Committed."  In addition, in the "Comments" column, the entry for Company M stated "$75K by December."

1    <u>Overt Act No. 41:</u>   On November 1, 2018, defendant GOLDMAN wrote

2    to Executive M via text message, asking for a meeting to "go through

3    the Huizar political stuff," referring to the $75,000 contribution to

4    PAC A Company M had committed to Huizar in exchange for Huizar's now

5    successful help with Project M.

6

7                              NICOLA T. HANNA
                               United States Attorney
8

9

10                             BRANDON D. FOX
                               Assistant United States Attorney
11                             Chief, Criminal Division

12                             MACK E. JENKINS
                               Assistant United States Attorney
13                             Chief, Public Corruption and
                                  Civil Rights Section
14
                               VERONICA DRAGALIN
15                             Assistant United States Attorney
                               Public Corruption and Civil
16                                Rights Section

17                             MELISSA MILLS
                               Assistant United States Attorney
18                             Public Corruption and Civil
                                  Rights Section
19

20

21

22

23

24

25

26

27

28