

FILED
CLERK, U.S. DISTRICT COURT

08/25/20

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DM _____ DEPUTY

NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
VERONICA DRAGALIN (Cal. Bar No. 281370)
MELISSA MILLS (Cal. Bar No. 248529)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2091/0647/0627
    Facsimile: (213) 894-6436
    E-mail:    mack.jenkins@usdoj.gov
            veronica.dragalin@usdoj.gov
            melissa.mills@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:20-CR-00369-PSG |
|---|---|
|        Plaintiff, | COOPERATION PLEA AGREEMENT FOR DEFENDANT MORRIS ROLAND GOLDMAN |
|         v. | |
| MORRIS ROLAND GOLDMAN,<br>  aka "Morrie Goldman," | |
|        Defendant. | |

    1.    This constitutes the plea agreement between MORRIS ROLAND GOLDMAN ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

<u>DEFENDANT'S OBLIGATIONS</u>

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a one-count information in the form attached to this agreement as Exhibit 1 or a substantially similar form, which charges defendant with Conspiracy, in violation of 18 U.S.C. § 371.

b.   Not contest the Factual Basis agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessment.

3.   Defendant further agrees to cooperate fully with the USAO, the Federal Bureau of Investigation ("FBI"), and, as directed by the USAO, any other federal, state, local, or foreign prosecuting,

1  enforcement, administrative, or regulatory authority.  This

2  cooperation requires defendant to:

3          a.   Respond truthfully and completely to all questions

4  that may be put to defendant, whether in interviews, before a grand

5  jury, or at any trial or other court proceeding.

6          b.   Attend all meetings, grand jury sessions, trials or

7  other proceedings at which defendant's presence is requested by the

8  USAO or compelled by subpoena or court order.

9          c.   Produce voluntarily all documents, records, or other

10 tangible evidence relating to matters about which the USAO, or its

11 designee, inquires.

12     4.   For purposes of this agreement: (1) "Cooperation

13 Information" shall mean any statements made, or documents, records,

14 tangible evidence, or other information provided, by defendant

15 pursuant to defendant's cooperation under this agreement or pursuant

16 to the letter agreement previously entered into by the parties dated

17 November 15, 2018 (the "Letter Agreement"); and (2) "Plea

18 Information" shall mean any statements made by defendant, under oath,

19 at the guilty plea hearing and the agreed to factual basis statement

20 in this agreement.

21                 THE USAO'S OBLIGATIONS

22     5.   The USAO agrees to:

23          a.   Not contest the Factual Basis agreed to in this

24 agreement.

25          b.   Abide by all agreements regarding sentencing contained

26 in this agreement.

27          c.   At the time of sentencing, provided that defendant

28 demonstrates an acceptance of responsibility for the offenses up to

and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

6.   The USAO further agrees:

a.   Not to offer as evidence in its case-in-chief in the above-captioned case or any other criminal prosecution that may be brought against defendant by the USAO, or in connection with any sentencing proceeding in any criminal case that may be brought against defendant by the USAO, any Cooperation Information. Defendant agrees, however, that the USAO may use both Cooperation Information and Plea Information: (1) to obtain and pursue leads to other evidence, which evidence may be used for any purpose, including any criminal prosecution of defendant; (2) to cross-examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b.   Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed.  Defendant understands, however, that Cooperation Information will be disclosed to the United States Probation and Pretrial Services Office and the Court, and that the Court may use Cooperation Information for the

purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c. In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d. If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 and 3 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1 to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

<u>DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION</u>

7. Defendant understands the following:

a. Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b. Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c. Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d.    At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance.  The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the USAO.

e.    The USAO's determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which defendant testifies or in which the government otherwise presents information resulting from defendant's cooperation.  That is, whether any other person, after trial, is found guilty or not guilty of any offense will have no effect on the government's sentencing recommendation for defendant.

<u>NATURE OF THE OFFENSES</u>

8.    Defendant understands that for defendant to be guilty of the crime charged in count one, that is, Conspiracy, in violation of 18 U.S.C. § 371, the following must be true: (1) beginning in or about June 2016, and ending on or about November 2018, there was an agreement between two or more persons to commit at least one crime as charged in the indictment; (2) defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

a.    For a person to be guilty of Federal Program Bribery, in violation of 18 U.S.C. § 666(a)(2), the following must be true: (1) Jose Huizar was an agent of a local government; (2) defendant

corruptly gave, offered, or agreed to give anything of value to Jose Huizar; (3) defendant intended to influence or reward Jose Huizar in connection with any business, transaction, or series of transactions of the local government involving anything of value of $5,000 or more; and (4) the local government received, in any one-year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

b.   For a person to be guilty of Mail Fraud, including through the Deprivation of Honest Services, in violation of 18 U.S.C. §§ 1341, 1346, the following must be true: (1) defendant devised or knowingly participated in a scheme or plan to deprive the citizens of Los Angeles of their right of honest services; (2) the scheme or plan consisted of a bribe or kickback in exchange for Jose Huizar's services; (3) Jose Huizar owed a fiduciary duty to the City; (4) defendant acted with the intent to defraud by depriving the City of its right of honest services; (5) defendant's act was material; that is, it had a natural tendency to influence, or was capable of influencing, the City's acts; and (6) defendant used, or caused someone to use, the mail to carry out or to attempt to carry out the scheme or plan.

<u>PENALTIES</u>

9.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 18 U.S.C. § 371, is: 5 years' imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

10.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.   Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

11.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.   Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.   Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

<u>FACTUAL BASIS</u>

12.   Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.   Defendant and the USAO agree to the statement of facts attached hereto as <u>Attachment A</u> and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement

8

and to establish the Sentencing Guidelines factors set forth in paragraph 14 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

<u>SENTENCING FACTORS</u>

13.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

14.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 12 | U.S.S.G. § 2C1.1(a)(1) |
| Bribe Value >$40,000: | +6 | U.S.S.G. §§ 2C1.1(b)(2); 2B1.1(b)(1)(D) |
| Elected Official: | +4 | U.S.S.G. § 2C1.1(b)(3) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

15.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

9

16.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

17.   Defendant understands that by pleading guilty, defendant gives up the following rights:

   a.   The right to persist in a plea of not guilty.

   b.   The right to a speedy and public trial by jury.

   c.   The right to be represented by counsel – and if necessary have the Court appoint counsel – at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel – and if necessary have the Court appoint counsel – at every other stage of the proceeding.

   d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

   e.   The right to confront and cross-examine witnesses against defendant.

   f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

   g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

   h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

### WAIVER OF APPEAL OF CONVICTION

18.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

### LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE

19.  Defendant agrees that, provided the Court imposes a total term of imprisonment of no more than 30 months, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Order 20-04 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d).

20.  The USAO agrees that, provided all portions of the sentence are at or below the statutory maximum specified above, the USAO gives up its right to appeal any portion of the sentence.

11

## RESULT OF WITHDRAWAL OF GUILTY PLEA

21. Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, or any federal rule, that any Cooperation Information or any evidence derived from any Cooperation Information should be suppressed or is inadmissible.

## EFFECTIVE DATE OF AGREEMENT

22. This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

## BREACH OF AGREEMENT

23. Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached. For example, if defendant knowingly, in an interview, before a grand jury, or at trial, falsely

accuses another person of criminal conduct or falsely minimizes defendant's own role, or the role of another, in criminal conduct, defendant will have breached this agreement.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a.   If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b.   The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action.

c.   The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d.   In any investigation, criminal prosecution, or civil, administrative, or regulatory action: (i) defendant will not assert, and hereby waives and gives up, any claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant

agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

24.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

25.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 14 are consistent with the facts of this case.  This paragraph permits both the USAO and defendant to submit full and complete factual

information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the Factual Basis agreed to in this agreement.

26. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

27. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//
//
//
//
//
//

1                PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

2      28.   The parties agree that this agreement will be considered

3 part of the record of defendant's guilty plea hearing as if the

4 entire agreement had been read into the record of the proceeding.

5 AGREED AND ACCEPTED

6 UNITED STATES ATTORNEY'S OFFICE
  FOR THE CENTRAL DISTRICT OF

7 CALIFORNIA

8 NICOLA T. HANNA
  United States Attorney

9

10                                           8/14/2020
  MACK E. JENKINS                 Date

11 VERONICA DRAGALIN
  MELISSA MILLS

12 Assistant United States Attorneys

13                                        8-14-2020
  MORRIS GOLDMAN               Date

14 Defendant

15                                         8-14-20
  STEPHEN MEISTER              Date

16 Attorney for Defendant
  MORRIS GOLDMAN

17

18

19

20

21

22

23

24

25

26

27

28

1                    CERTIFICATION OF DEFENDANT

2        I have read this agreement in its entirety.  I have had enough

3   time to review and consider this agreement, and I have carefully and

4   thoroughly discussed every part of it with my attorney.  I understand

5   the terms of this agreement, and I voluntarily agree to those terms.

6   I have discussed the evidence with my attorney, and my attorney has

7   advised me of my rights, of possible pretrial motions that might be

8   filed, of possible defenses that might be asserted either prior to or

9   at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a),

10  of relevant Sentencing Guidelines provisions, and of the consequences

11  of entering into this agreement.  No promises, inducements, or

12  representations of any kind have been made to me other than those

13  contained in this agreement.  No one has threatened or forced me in

14  any way to enter into this agreement.  I am satisfied with the

15  representation of my attorney in this matter, and I am pleading

16  guilty because I am guilty of the charge and wish to take advantage

17  of the promises set forth in this agreement, and not for any other

18  reason.

19

20  _____         ___8-14-2020_____
    MORRIS ROLAND GOLDMAN               Date

21  Defendant

22

23

24

25

26

27

28

                                17

1

CERTIFICATION OF DEFENDANT'S ATTORNEY

2       I am MORRIS ROLAND GOLDMAN's attorney.  I have carefully and
3   thoroughly discussed every part of this agreement with my client.
4   Further, I have fully advised my client of his rights, of possible
5   pretrial motions that might be filed, of possible defenses that might
6   be asserted either prior to or at trial, of the sentencing factors
7   set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines
8   provisions, and of the consequences of entering into this agreement.
9   To my knowledge: no promises, inducements, or representations of any
10  kind have been made to my client other than those contained in this
11  agreement; no one has threatened or forced my client in any way to
12  enter into this agreement; my client's decision to enter into this
13  agreement is an informed and voluntary one; and the factual basis set
14  forth in this agreement is sufficient to support my client's entry of
15  a guilty plea pursuant to this agreement.

16

17  STEPHEN MEISTER                          8-14-20
    Attorney for Defendant                   Date
18  MORRIS ROLAND GOLDMAN

19

20

21

22

23

24

25

26

27

28

**Attachment A**

FACTUAL BASIS

1.   Defendant MORRIS ROLAND GOLDMAN, also known as "Morrie Goldman" ("defendant GOLDMAN") was a registered lobbyist and consultant in the City of Los Angeles (the "City"), including for Company M, which had a development project in the City.  Defendant GOLDMAN was also a close associate of and fundraiser for Jose Huizar, the Councilmember of Council District 14 ("CD-14"), and agent of the City.  The City government received more than $10,000 per fiscal year in funds from the United States in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.

2.   Beginning no later than June 2016, Huizar and others planned to have Relative A-1 succeed him as Councilmember for CD-14 in order to maintain a political stronghold in the City.  Huizar's last term as the CD-14 Councilmember was set to expire at the end of 2020, when he was no longer eligible for re-election.  In furtherance of this plan, defendant GOLDMAN, Huizar, George Esparza, and others established a political action committee ("PAC"), PAC A, that was registered as a "general purpose" PAC purported to benefit a broad array of candidates and causes but was, in fact, primarily intended to benefit Relative A-1's campaign.  Huizar, on numerous occasions, expressed to defendant GOLDMAN that it was important to accumulate a significant amount of financial contributions early on in order to scare off potential candidates contemplating running against Relative A-1.  At Huizar's request and direction, defendant GOLDMAN thereafter solicited and pressured real estate developers with projects pending

DEFT. INITIALS

1

1  before the City to contribute to PAC A in exchange for favorable

2  treatment of their projects by Huizar and the City, including in the

3  Planning and Land Use Management ("PLUM") Committee, Economic

4  Development Committee, and City Council.

5      3.  Between in or about June 2016 and in or about November

6  2018, in Los Angeles County, within the Central District of

7  California, defendant GOLDMAN, while employed by Company M as its

8  lobbyist and acting to benefit Company M, agreed with co-conspirators

9  Huizar and Executive M, an executive of Company M, among others, to

10  knowingly and intentionally commit offenses against the United

11  States, namely, Bribery Concerning Programs Receiving Federal Funds

12  and Mail Fraud, including through the Deprivation of Honest

13  Services.  Specifically, in or about September 2018, defendant

14  GOLDMAN agreed with Huizar and Executive M that Company M would

15  contribute an additional $50,000 to PAC A to benefit Relative A-1's

16  campaign in exchange for official acts from Huizar, namely, to vote

17  against a union appeal on Company M's project in the PLUM Committee.

18      4.  Defendant GOLDMAN entered into this agreement, knowing of

19  the agreement's objects, and intending to help accomplish it.  In

20  furtherance of this agreement, defendant GOLDMAN and co-conspirators

21  Huizar and Executive M, among others, committed various acts

22  described below.

23  **A.  Defendant GOLDMAN's Role in PAC A**

24      5.  On May 2, 2017, in a telephone call, defendant GOLDMAN and

25  Esparza discussed the strategy to use political action committees to

26  financially benefit Relative A-1's campaign.  Specifically, defendant

27  GOLDMAN requested a dinner with Huizar to "talk about some political

28

DEFT. INITIALS 

2

1  [contribution] stuff" and the "committee he wants to open."
2  Defendant GOLDMAN told Esparza that Huizar Associate 3 and defendant
3  GOLDMAN wanted to talk to Huizar about "some ideas on what to do"
4  with the PAC "[Huizar] wants to do for [Relative A-1]."  Defendant
5  GOLDMAN and Esparza then discussed that Huizar no longer wanted to
6  use PAC B with Huizar Associate 2 but instead wanted his own PAC.
7  Defendant GOLDMAN then stated: "we have some ideas on how to
8  structure it and we wanna talk to him about it."
9       6.    On May 18, 2017, defendant GOLDMAN and Esparza continued
10 discussing establishing a PAC to benefit Relative A-1's campaign.
11 Specifically, defendant GOLDMAN told Esparza: "what we have to do is
12 open a general purpose committee."  Defendant GOLDMAN went on to
13 explain: "you and I can run it. But we need to have someone who can
14 be the face of it."  Defendant GOLDMAN stated: "I would envision Jose
15 [Huizar], saying, 'Let's have ten people at ten thousand bucks each.'
16 You know, once or twice a year.... And then in three years [closer to
17 the CD-14 election] ... you're talking, you know, almost a million
18 dollars."  Defendant GOLDMAN reiterated that they needed "someone who
19 can just sort of be the face of it, so that it's not you or me....
20 And then you and I can run it."  Defendant GOLDMAN then explained
21 that they needed to "have someone else" raise money into the PAC as
22 well, and make some additional expenditures, adding: "You follow? So
23 it's not just [Relative A-1]. It's not just Jose [Huizar]."
24 Defendant GOLDMAN explained: "[Relative A-1] gets the lion's share of
25 it and Jose [Huizar] would do the lion's share of the fundraising,
26 but it's not just Jose [Huizar] for [Relative A-1]."  Defendant
27 GOLDMAN then told Esparza he had people ready to start contributing
28

DEFT. INITIALS

                                3

now.  During the same phone call about political contributions to
help Huizar and Relative A-1, defendant GOLDMAN emphasized to Esparza
that he needed help from the City, specifically the City's digital
sign ordinance "to move on the 30th" because it would affect one of
his developer clients, adding: "I like this client. They pay me a lot
of money."

7.   On May 22, 2017, in a telephone call, defendant GOLDMAN and
Esparza discussed an upcoming meeting with Huizar for one of
defendant GOLDMAN's developer clients.  Defendant GOLDMAN noted:
"It's a relationship thing, it's very consistent with sort of the,
the long-term MORRIE [GOLDMAN], George [Esparza], Jose [Huizar]
plan."

8.   On May 25, 2017, in a telephone call, defendant GOLDMAN
told Esparza: "I talked to Jose [Huizar] yesterday and so we're green
lighted," referring to the idea of establishing a PAC to benefit
Relative A-1.  Defendant GOLDMAN then told Esparza "we need to find
somebody in the district, a very good close either family friend or
relative" to serve in the role of "treasurer or the controlling
person, you know, on paper."  Esparza responded: "So I'll ask
[Huizar] too who he may have in mind, okay."

9.   On June 2, 2017, in a telephone call, defendant GOLDMAN,
Huizar, and Relative A-1 discussed establishing a PAC to support
Relative A-1's campaign.  Defendant GOLDMAN explained: "the PAC ...
that's going to be strictly political money and, you know, two years
from now, or three years, there'll be a million dollars in there. You
won't be able to direct it, but there'll be people, you know, [who]
are like minded."

DEFT. INITIALS 

4

1     10.   On or around June 22, 2017, defendant GOLDMAN met with

2 Huizar, Esparza, and Justin Kim and discussed establishing a PAC to

3 raise money for Relative A-1's campaign.  During this meeting, Huizar

4 suggested having Kim find an associate to serve as the "face" of the

5 PAC to disguise Huizar's involvement and the PAC's connection to CD-

6 14.

7     11.   On June 22, 2017, in a telephone call, defendant GOLDMAN

8 and Huizar discussed the PAC to benefit Relative A-1's campaign,

9 specifically the need to install someone to run the PAC that Huizar

10 would be able to covertly control or influence.  Defendant GOLDMAN

11 stated that regarding the treasurer for the PAC, "I just really want

12 to again encourage you to think about someone from your personal

13 circle."  Huizar responded: "Yeah, no, I agreed to that, you made a

14 very good point which is, look if I go with somebody that Justin

15 [Kim] recommends, I thought it was cool [be]cause it's more distance

16 from me, right? Some Korean. Who's gonna know some Korean, some

17 random Korean? 'What are they doing fundraising over here? It must be

18 an independent assistant ... from Huizar.' But, the more I thought

19 about it, I think there's a lot more benefit to have someone who's

20 close to me, because you're right, what if like, Justin [Kim] and I

21 have a falling out and there's a million dollars standing in

22 committee. I'm supposed to have not anything to do with it,

23 supposedly I don't have anything to do with it, so."  Defendant

24 GOLDMAN responded: "I mean, in an ideal world, I mean, we're all

25 friends, we're all loyal, but you know, things happen. I just want to

26 make sure you're protected."  Defendant GOLDMAN and Huizar then

27 discussed asking one of defendant GOLDMAN's developer clients for

28

DEFT. INITIALS 

5

"seed money" for the PAC.  Defendant GOLDMAN stated: "he's my client, but you're my friend. And we have an end game."  Defendant GOLDMAN and Huizar agreed to "seed the PAC early."

12.   In the subsequent months, defendant GOLDMAN and Huizar had regular discussions regarding their strategy for opening PAC A and targeting developers with projects pending before the City to contribute to Relative A-1's campaign.

13.   On October 18, 2017, a political account supervisor sent an initial Statement of Organization for PAC A to the California Secretary of State by U.S. Mail.  Defendant GOLDMAN was listed as an "additional principal officer" of the PAC.

14.   Beginning in or around April 2018, defendant GOLDMAN, Huizar, and Huizar Associate 3 met regularly to discuss the fundraising plan for Relative A-1's campaign.  Specifically, on March 26, 2018, Huizar sent a text message to defendant GOLDMAN, writing: "We should meet every two weeks to discuss progress on pac. Me, u, and [Huizar Associate 3]. What u think? Can I have [a CD-14 staffer] set something up?"  On March 29, 2018, Huizar instructed his staffer in an e-mail: "please schedule a meeting with me and MORRIE [GOLDMAN] and [Huizar Associate 3] a meeting every two weeks to go over 'PAC'. [T]hey will know what that's about."

15.   During their regular meetings to discuss the PACs, among other things, Huizar, defendant GOLDMAN, and Huizar Associate 3 created and discussed a document titled "Fundraising Plan," which tracked developers, contribution amounts, and the designated person responsible for soliciting the contributions, which included Huizar, defendant GOLDMAN, and Huizar Associate 3, among others.  The

DEFT. INITIALS

6

1  "Fundraising Plan" document included a section titled "MORRIE" for

2  tracking contributions to PAC A, and a separate section titled

3  "[Huizar Associate 2]" for tracking contributions to PAC B.

4       16.  On April 4, 2018, Huizar sent an e-mail to defendant

5  GOLDMAN and Huizar Associate 3, writing: "Good meeting yesterday.

6  (1). MORRIE [GOLDMAN], Please have accounting of PAC [A] for the next

7  time we meet. My records show there are about 55 k in account. Please

8  bring all income and what expenses we have had to date."  Huizar

9  often asked for an accounting of PAC A, and defendant GOLDMAN

10 understood that Huizar wanted to control the expenditures of PAC A to

11 benefit Relative A-1's campaign.

12      17.  On April 13, 2018, Huizar sent an e-mail to defendant

13 GOLDMAN, writing: "Hey MORRIE [GOLDMAN]. Attached is fundraising plan

14 I have. See you Monday. I was gonna propose that you and I just meet

15 on this plan in future and we can just nudge [Huizar Associate 3] to

16 collect. He just has 2 (although large) targets to collect."  The

17 attachment titled "[PAC A]" included a list of developers and

18 individuals, amounts, notes, and the individual responsible for

19 soliciting the contribution.  Defendant GOLDMAN had eight targets for

20 contributions totaling $275,000, including developers with projects

21 pending before the City and Huizar.  Huizar had twelve targets

22 totaling $680,000, and Huizar Associate 3 had two targets totaling

23 $200,000.  In total, the fundraising plan had $1,155,000 in targeted

24 contributions for PAC A to benefit Relative A-1's campaign.

25 Subsequently, Huizar sent a text message to defendant GOLDMAN,

26 writing: "Just sent u email on pac and targets."

27

28

DEFT. INITIALS

7

**B.     Project M Bribery Scheme**

18.   Beginning in approximately 2014, Company M employed defendant GOLDMAN as a lobbyist to facilitate a relationship with Huizar, whereby Company M would request Huizar's assistance on a number of issues related to Project M, and provide financial contributions at Huizar's request.  During defendant GOLDMAN's employment as Company M's lobbyist and at all times listed below in this Factual Basis, defendant GOLDMAN acted as an agent of Company M and for the benefit of Company M.

$25,000 Contribution to PAC B

19.   In or around August 2016, defendant GOLDMAN and Executive M had discussions via text message regarding the General Plan Amendment for Project M.  Specifically, on August 2, 2016, Executive M wrote: "We have a real problem. [The Planning Department] did not approve our gpa [General Plan Amendment] again. Let's talk asap in the morning."  On August 11, 2016, defendant GOLDMAN wrote to Executive M: "I got the meeting request in? How we doing on the [General Plan Amendment] motion, etc?... Spoke to Huizar. We will meet ne[x]t Thursday and he will introduce the motion to initiate."

20.   On August 18, 2016, Huizar, defendant GOLDMAN, and Executive M met at Huizar's City Hall office to discuss Project M. At the meeting, defendant GOLDMAN and Executive M asked Huizar to file a motion to initiate a General Plan Amendment for Project M. Huizar agreed to initiate the General Plan Amendment, either by exerting pressure on the Planning Department to do so or by filing a motion.

DEFT. INITIALS

8

1     21.  In September 2016, Huizar asked defendant GOLDMAN for

2  contributions to PAC B from defendant GOLDMAN's clients with projects

3  pending in CD-14, including from Executive M on behalf of Project M,

4  in connection with a homelessness initiative that was on the ballot

5  in November 2016 (Measure HHH).  Defendant GOLDMAN agreed to convey

6  the requests to his clients.

7     22.  On October 13, 2016, Esparza sent a text message to

8  defendant GOLDMAN providing the information for PAC B, and adding:

9  "according to my boss [Huizar] that's for [another developer] and

10  [Company M]. He said he spoke to u about it."

11     23.  On October 13, 2016, defendant GOLDMAN sent an e-mail to

12  Executive M, passing on account information for PAC B he received

13  from Esparza.  Executive M replied: "Timing and amount?"  Defendant

14  GOLDMAN then wrote: "25K as soon as possible."

15     24.  On October 14, 2016, defendant GOLDMAN sent an e-mail to

16  Executive M, attaching a remit form for PAC B, and writing: "Huizar

17  is asking that contributions be directed to this committee. Please

18  hold off if you are processing a contribution to the other primary

19  committee."  Defendant GOLDMAN conveyed this to Executive M because

20  he understood Huizar wanted the contribution to more directly benefit

21  Huizar, which could be better achieved by the money going to PAC B

22  rather than the official Measure HHH campaign committee.

23     25.  On October 26, 2016, Executive M wrote to defendant GOLDMAN

24  in a text message: "I should have checks by tomorrow. All I need is

25  the letter. Would it be worth setting up a quick drink or coffee with

26  Jose [Huizar] when we deliver? Could be good to talk big picture,

27  etc."  Defendant GOLDMAN understood that Executive M wanted to

28

DEFT. INITIALS

9

1    discuss the merits of Project M and seek Huizar's assistance with the
2    project when delivering the $25,000 to PAC B, as Huizar had
3    requested.

4        26.   On October 31, 2016, defendant GOLDMAN sent a text message
5    to Esparza, writing: "When can I get [Executive M] in with Jose
6    [Huizar] to deliver the checks?"  Defendant GOLDMAN was referring to
7    the $25,000 contribution to PAC B, which Huizar had requested, and
8    Executive M's request to discuss Project M with Huizar at the same
9    time.

10       Additional $25,000 Contribution to PAC B

11       27.   On February 15, 2017, Huizar and defendant GOLDMAN met for
12   lunch in Downtown Los Angeles to discuss various projects.  At the
13   lunch, Huizar asked defendant GOLDMAN for an additional $25,000
14   contribution to PAC B from Company M, in connection with a
15   homelessness initiative that was on the ballot in March 2017 (Measure
16   H).  Defendant GOLDMAN agreed to and did convey the request to
17   Executive M.

18       28.   On February 21, 2017, defendant GOLDMAN informed Esparza
19   via text message that Executive M "acknowledged the conversation with
20   Jose [Huizar]" regarding Company M's additional contribution to PAC
21   B.

22       29.   On February 24, 2017, Executive M sent an e-mail to another
23   Company M employee, copying defendant GOLDMAN, with the subject line
24   "questions regarding Huizar PAC," and writing: "You can direct any
25   specific questions on the PAC to MORRIE [GOLDMAN], who is cc'd."

26       30.   On or about March 2, 2017, Company M made a $25,000
27   contribution to PAC B, at Huizar's direction.

28

DEFT. INITIALS                     10

31.  On March 20, 2017, Executive M sent an e-mail to defendant GOLDMAN, writing: "Do you think we are in a more favored status with Jose [Huizar] compared to [another developer]?"  Defendant GOLDMAN understood Executive M to be asking whether Company M's contributions of $50,000 total to PAC B, at Huizar's request, placed them in a "favored status."  Defendant GOLDMAN understood the "favored status" to mean more likely to receive favorable official acts from Huizar on Project M.

32.  On May 5, 2017, in a telephone call, Huizar and defendant GOLDMAN discussed Company M's contribution to PAC B at Huizar's request.  Huizar and defendant GOLDMAN found out that PAC B publicly disclosed Company M as a top donor for a Los Angeles City Council candidate.  Defendant GOLDMAN told Huizar that a reporter was "asking who asked us [Company M] for the donation, but we, we're not gonna respond to that."  Huizar responded: "Thank you very much.  I appreciate that."  Defendant GOLDMAN stated: "No, of course."  Defendant GOLDMAN then stated: "When I told George [Esparza], I said, look, my two things that I gotta protect you know ... [Company M] and gotta protect you [Huizar]."  Huizar responded: "Yeah, gotcha, gotcha."  Huizar then stated "we can't be sloppy about this and trust, uh, [Huizar Associate 2], but, anyway, we will save that conversation for tomorrow, ok?"  Among other things, defendant GOLDMAN was concerned about the media finding out that Huizar directed the $25,000 PAC B contribution by Company M.

33.  On May 9, 2017, Executive M sent an e-mail to defendant GOLDMAN asking about a media inquiry regarding a Company M campaign contribution to PAC B in support of a Los Angeles City Council

DEFT. INITIALS

11

1  candidate.  Defendant GOLDMAN responded by e-mail, reminding

2  Executive M that the PAC B contribution "was an 'ask' from Jose

3  Huizar."

4      $25,000 Contribution and Additional $25,000 Commitment to PAC A

5      34.  Beginning in around January 2018, defendant GOLDMAN had

6  conversations with Huizar and Executive M regarding Project M's

7  approval in the PLUM Committee and City Council.  Specifically,

8  Company M wanted the City to approve Project M with a 5% affordable

9  housing requirement (which dictates how many units would be

10  designated for low-income residents), while Huizar initially insisted

11  on 11% affordable housing.  The higher the percentage of units were

12  designated for low-income residents the less profit Company M would

13  obtain.  Executive M was concerned he would suffer significant

14  professional consequences, including the loss of his job with Company

15  M, if Project M was not approved, so he asked for defendant GOLDMAN's

16  help because Executive M could not get through to Huizar.  Executive

17  M also told defendant GOLDMAN that if Project M did not obtain its

18  preferred affordable housing requirements it would threaten the

19  viability of Project M altogether.

20      35.  On January 8, 2018, Huizar and defendant GOLDMAN had a

21  discussion via text message regarding Project M and Company M's

22  willingness to contribute to their newly established PAC A to benefit

23  Relative A-1's campaign.  Specifically, Huizar wrote: "Let's do the

24  pac stuff later this week. See u there at 6. What's purpose of

25  tonight's meeting? Are they [Company M] gonna help with pac?"

26  Defendant GOLDMAN replied: "[Executive M] wants to talk about

27  [Project M] and see if you're comfortable with the height and

28

DEFT. INITIALS                 12

1  affordability levels." Huizar answered: "Are they gonna help with
2  pac?" Defendant GOLDMAN replied: "I'm sure they will, however - as
3  your friend - let's discuss this in a different text thread."
4  Defendant GOLDMAN understood that Huizar was conditioning his
5  official assistance on Project M (specifically, approvals related to
6  affordability and height) on Company M's financial support for PAC A,
7  which defendant GOLDMAN knew was illegal. Defendant GOLDMAN was
8  warning Huizar not to explicitly document that understanding in a
9  text message thread because it was incriminating.

10      36.  On February 23, 2018, Huizar and defendant GOLDMAN had a
11 discussion via text message regarding PAC A. Specifically, defendant
12 GOLDMAN wrote: "Are you checking the Confide App for texting on your
13 iPhone?" Huizar replied: "I never use it but it is there. I have no
14 messages." Defendant GOLDMAN wrote: "I was going to text you about
15 your meeting with [PAC A's attorney]. Wanted to see if we got any
16 clarification. Confide is good for texting because it is like Snap
17 Chat...message disappears."

18      37.  On March 1, 2018, defendant GOLDMAN had a meeting with
19 Huizar. During the meeting, defendant GOLDMAN and Huizar discussed
20 Company M's contributions to PAC A. Specifically, Huizar asked for a
21 $50,000 contribution to PAC A to be paid in two installments, $25,000
22 as soon as possible and another $25,000 by the end of the year, after
23 the approval of Project M. Defendant GOLDMAN understood that Huizar
24 requested two separate contributions so as not to draw attention to a
25 large contribution of $50,000 from Company M. Defendant GOLDMAN
26 agreed to convey the request to Executive M.

27

28

DEFT. INITIALS __              13

38.   On March 14, 2018, defendant GOLDMAN met with Executive M and relayed Huizar's request to have Company M contribute $50,000 to PAC A, which defendant GOLDMAN explained was designed to benefit Relative A-1's campaign for the CD-14 seat.   Executive M agreed. Later that same day, defendant GOLDMAN met with Huizar to discuss PAC A, including the fact that Executive M agreed to have Company M contribute to PAC A.

39.   On March 15, 2018, defendant GOLDMAN sent an e-mail to Executive M with the subject line "[PAC A]," writing: "this is the committee we previously discussed," and attaching a contribution form for PAC A.

40.   On April 13, 2018, Huizar sent an e-mail to defendant GOLDMAN, attaching a document titled "[PAC A]" that included, among other things, an entry for Company M for $50,000, with the note: "B/4 June. 2 checks. 2 Entities."   Defendant GOLDMAN understood that Huizar requested two separate checks from two separate entities so as not to draw attention to a large $50,000 contribution from Company M.

41.   On May 8, 2018, defendant GOLDMAN and Executive M had a discussion via text message regarding Executive M's significant concerns regarding Project M's progress and his desire for Huizar or a CD-14 staffer to pressure other City officials in the Planning Department to benefit Project M.   Specifically:

Executive M: "Very important that [City Staffer A-2] calls [a Planning Department official] letting them know he supports the height etc. please please make sure this happens prior."

Defendant GOLDMAN: "Yes. I have a call into [City Staffer A-2]."

Executive M: "Critical. Would be a huge issue otherwise with those people Attending. Maybe [Huizar] would be willing to call [a Planning Department official]."

DEFT. INITIALS

14

Defendant GOLDMAN: "[Huizar] is traveling. Not around this week."

Executive M: "Can't he put in a call? I'm just really concerned."

Defendant GOLDMAN: "Me too. That's why I sent you the list of invited attendees. It might be a good idea for [a consultant] to join us."

Executive M: "Did you hound [City Staffer A-2]?"

Defendant GOLDMAN: "Yes."

Executive M: "And why can't Huizar put in a call? Takes 5 mins"

Defendant GOLDMAN: "He's in Caribbean on family vacation. I'd rather have the call come from [City Staffer A-2]. He is in the weeds on the project."

Executive M: "Can he come to meeting?"

Defendant GOLDMAN: "He's not going to go to a meeting in Planning Department. [City Staffer A-2] will let them know their position, and then make the changes in PLUM."

...

Executive M: "This would be a disaster if they took a position to deny This meeting seems to be a really bad idea now. When does Jose [Huizar] get back?"

Defendant GOLDMAN: "Spoke with [City Staffer A-2]. He will speak with [the Planning Department official], and then call me to report back prior to our meeting."

42.   In or about June 2018, Company M made a $25,000 contribution to PAC A, in two checks of $12,500 each from two separate entities, at Huizar's direction.

43.   On June 14, 2018, the City Planning Commission approved Project M, allowing it to move forward to a hearing before the PLUM Committee and ultimately City Council. However, the City Planning

DEFT. INITIALS

15

Commission imposed certain conditions for approval, including an
affordable housing requirement of 11% "Very Low Income" units that
would ensure a significant percentage of very low-income individuals
had an opportunity for housing at the project.

   Additional $50,000 Commitment to PAC A in Exchange for Huizar's
   Help on Project M

   44.   On August 9, 2018, defendant GOLDMAN sent an e-mail to
Executive M regarding Project M's upcoming hearing before the PLUM
Committee, writing: "We need to address the Labor issue.
Seriously...we need to take [the executive of a labor union] off the
chess board."   Defendant GOLDMAN and Executive M had discussed that
the labor union was an issue that could affect Project M's approval
in the PLUM Committee with the potential to create delays and
increase costs.   In addition, Executive M told defendant GOLDMAN that
requiring a union Project Labor Agreement threatened the viability of
Project M, resulting in negative repercussions for Executive M
personally, including the potential loss of his job.

   45.   On September 4, 2018, in an e-mail, Executive M asked
defendant GOLDMAN: "Any updates on Huizar meeting?"   Defendant
GOLDMAN responded: "I'm having a one-on-one meeting with [Huizar],
and you're #1 on the agenda."

   46.   On September 4, 2018, Huizar met with defendant GOLDMAN
regarding the labor union issue Company M was facing on Project M.
During the meeting, defendant GOLDMAN requested on behalf of
Executive M for Huizar to vote against the labor union's appeal by
approving Project M in the PLUM Committee.   Huizar explained that
voting against the labor union, which he considered an ally, could
have negative ramifications on Relative A-1's campaign.   Defendant

DEFT. INITIALS

16

1   GOLDMAN understood this to mean that voting against the labor union

2   may result in the labor union opposing Relative A-1's election, which

3   would be a significant blow to her chance for success.  Because of

4   this risk, Huizar told defendant GOLDMAN something to the effect that

5   if he were to vote against the labor union in the PLUM Committee,

6   then Company M would have to make it worthwhile.  Defendant GOLDMAN

7   understood this to mean Huizar expected a financial benefit from

8   Company M in exchange for his efforts with the labor union.

9        47.  On September 6, 2018, defendant GOLDMAN and Executive M met

10  to discuss Project M and resolving its labor issue.  During the

11  meeting, defendant GOLDMAN discussed with Executive M that they

12  needed to make it worthwhile for Huizar's intervention with the labor

13  union.  Executive M and defendant GOLDMAN agreed that Company M

14  should offer to make an additional $50,000 contribution to PAC A.

15  Company M had previously agreed to contribute $50,000, and paid the

16  first $25,000 installment in June 2018.  This additional $50,000

17  contribution would bring the total agreed-upon contributions on

18  behalf of Company M to PAC A to $100,000 in exchange for Huizar's

19  assistance with Project M.

20       48.  On September 6, 2018, Huizar and defendant GOLDMAN met

21  outside a restaurant in Boyle Heights to discuss the new arrangement

22  with Executive M.  At the meeting, defendant GOLDMAN conveyed the

23  offer of an additional $50,000 contribution to PAC A, bringing the

24  total to $100,000, and Huizar agreed to accept the contribution in

25  exchange for voting to approve Project M over objections by the labor

26  union.  Huizar also requested a private meeting with Executive M.

27

28

DEFT. INITIALS

17

1   Later that day, in a text message, defendant GOLDMAN asked Executive

2   M: "Can you do dinner with Huizar on Tuesday, 9-25?"

3      49.   On September 12, 2018, while Huizar was negotiating the

4   additional financial benefit he sought from Executive M and Company

5   M, Huizar used his official position as the PLUM Chair to postpone

6   his committee's hearing on Project M to October 2, 2018, thereby

7   causing the project to be delayed.

8      50.   On September 24, 2018, in a text message, defendant GOLDMAN

9   told Huizar: "We are meeting [Executive M] tomorrow for dinner. Do

10   you still want [a restaurant in downtown Los Angeles], or would you

11   like someplace a bit more private?"

12      51.   On September 24, 2018, in a text message, defendant GOLDMAN

13   told Executive M: "Meeting is moved to breakfast on 10-04 @ 9 AM."

14   Executive M replied: "But that pushes our date??? This is a

15   disaster."  Defendant GOLDMAN responded: "Yes....it pushes the date.

16   It's going to get done."  Defendant GOLDMAN and Executive M were

17   discussing the private meeting between Executive M and Huizar, and

18   its effect on delaying the PLUM Committee hearing for Project M.

19      52.   On September 26, 2018, in a text message, defendant GOLDMAN

20   asked Executive M: "any chance you can do your one on one dinner with

21   Huizar THIS Friday, 9-28?"  Executive M replied: "Yes. I'm assuming

22   hearing date is the same?"

23      53.   On September 28, 2018, Huizar and Executive M had a private

24   meeting to discuss securing Huizar's support for Project M, its

25   approval in the PLUM Committee, and Company M's support for Relative

26   A-1's campaign.

27

28

DEFT. INITIALS

18

54.   On September 28, 2018, Huizar sent a text message to defendant GOLDMAN, writing: "Good meeting with [Executive M]. He is willing to help [Relative A-1] committee. He will collect from consultant/contractors. We didn't discuss amount. Please enlist him for your event and ask him to collect 15-20 k for your event."  Based on his conversations with Huizar and Executive M, including this text message, defendant GOLDMAN understood that Executive M and Huizar confirmed their agreement related to the PAC A contribution at the dinner defendant GOLDMAN facilitated.  Further, Huizar wanted defendant GOLDMAN to have Executive M additionally collect individual contribution checks for Relative A-1's primary campaign committee to deliver at the upcoming fundraiser defendant GOLDMAN was hosting for her.

55.   On October 2, 2018, Huizar used his official position as the PLUM Committee Chair to postpone his committee's hearing on Project M to October 16, 2018.

56.   On October 11, 2018, Huizar, Executive M, Employee M and defendant GOLDMAN attended a fundraiser for Relative A-1 hosted by defendant GOLDMAN.  At the fundraiser, Executive M had a manila envelope that he told defendant GOLDMAN was for Huizar.  When defendant GOLDMAN asked Executive M what was in the envelope, Executive M declined to answer and instead told defendant GOLDMAN that Huizar would tell defendant GOLDMAN if Huizar wanted him to know.

57.   On October 13, 2018, Executive M sent a text message to defendant GOLDMAN regarding the upcoming PLUM Committee hearing for Project M, asking: "Anyone else on plum we should connect with?"

DEFT. INITIALS 

19

1  Defendant GOLDMAN replied: "I was thinking about it but I really
2  don't want to call attention to it. I would rather let Jose [Huizar]
3  power play it through."

4      58.  On October 16, 2018, Huizar voted to deny the union appeal
5  and to approve Project M in the PLUM Committee, including accepting
6  certain modifications requested by Company M.  Specifically, the PLUM
7  Committee accepted Company M's preferred modifications to the
8  affordable housing restrictions, thereby undoing the more stringent
9  requirements recommended by the City Planning Commission.  As a
10  result of Huizar's approval and undoing the CPC recommendations,
11  Company M obtained significant reductions to Project M's affordable
12  housing requirements, from 11% "Very Low Income" units to 6%
13  "Moderate Income" units.  The changes resulted in overall significant
14  savings for Company M, which together with the denial of the labor
15  union's appeal resulted in, according to Executive M, saving the
16  viability of Project M.

17      59.  That same day after the PLUM Committee approval, in a text
18  message, defendant GOLDMAN told Executive M: "Let's talk tomorrow.
19  I'm seeing Jose [Huizar] on Thursday, so I know he will bring up
20  follow up on a few items."  Defendant GOLDMAN meant that Huizar would
21  bring up Company M's commitment to contribute the remaining $75,000
22  to PAC A.

23      60.  On October 18, 2018, Huizar and defendant GOLDMAN had a
24  meeting at Huizar's residence.  Among other things, Huizar brought up
25  Company M's commitment to contribute to PAC A.

26      61.  On October 31, 2018, Huizar voted to approve Project M in
27  City Council.

28



DEFT. INITIALS                           20

62.   On or around October 31, 2018, defendant GOLDMAN updated a document tracking commitments and contributions made to PAC A.  Among other things, the document had an entry for Company M with the figure $25,000 in the column titled "Paid" and $75,000 in the column titled "Committed."  In addition, in the "Comments" column, the entry for Company M stated "$75K by December."  Defendant GOLDMAN understood this notation to represent Company M's commitment to contribute an additional $75,000 to PAC A by the end of 2018 for a total of $100,000 to be paid to PAC A by Company M at Huizar's request.

63.   On November 1, 2018, defendant GOLDMAN and Executive M had a discussion via text message regarding contributions to PAC A. Specifically, defendant GOLDMAN wrote: "Can we meet up next week and go through the Huizar political stuff?"  Defendant GOLDMAN meant the $75,000 PAC contribution Company M had committed to Huizar in exchange for Huizar's now successful help with Project M.

DEFT. INITIALS

21