1            UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,        )
                                     )
6            PLAINTIFF,              )      CASE NO.
                                     )
7            vs.                     )      CR 20-00369-JFW
                                     )
8   MORRIS ROLAND GOLDMAN,           )
                                     )      PAGES 1 TO 54
9            DEFENDANT.              )
    _____)

10

11

12

13                  REPORTER'S TRANSCRIPT OF
             CHANGE OF PLEA VIA VIDEOCONFERENCING
14              WEDNESDAY, SEPTEMBER 30, 2020
                        8:12 A.M.
15               LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22

23   _____

             MIRANDA ALGORRI, CSR 12743, RPR, CRR
24            FEDERAL OFFICIAL COURT REPORTER
              350 WEST 1ST STREET, SUITE 4455
25             LOS ANGELES, CALIFORNIA 90012
                 MIRANDAALGORRI@GMAIL.COM

| | |
|---|---|
| 1 | **APPEARANCES OF COUNSEL:** |
| 2 | |
| 3 | **FOR THE PLAINTIFF:** |
| 4 | NICOLA T. HANNA |
| | UNITED STATES ATTORNEY |
| 5 | BY:  MACK JENKINS |
| | Assistant United States Attorney |
| 6 | United States Courthouse |
| | 312 North Spring Street |
| 7 | Los Angeles, California 90012 |
| 8 | |
| | **FOR THE DEFENDANT:** |
| 9 | |
| | MEISTER LAW OFFICES |
| 10 | BY:  STEPHEN A. MEISTER |
| | 515 South Flower Street |
| 11 | Suite 1800 |
| | Los Angeles, California 90071 |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1          **LOS ANGELES, CALIFORNIA; WEDNESDAY, SEPTEMBER 30, 2020**

2                              **8:12 A.M.**

3                                **---**

4

5          THE CLERK:  Calling CR 20-369-JFW, United States

6   of America versus Morris Roland Goldman.

7          Counsel, please state your appearances.

8          MR. JENKINS:  Good morning, Your Honor.

9   Mack Jenkins on behalf of the United States appearing

10  telephonically.

11          MR. MEISTER:  Good morning, Your Honor.  I'm

12  Steve Meister, Mr. Goldman's lawyer.

13          THE COURT:  And Mr. Goldman is present?

14          MR. MEISTER:  He is.

15          THE COURT:  Could Mr. Goldman raise his hand?

16  All right.  Good morning to all.  I just wanted to make sure I

17  understand where everybody is situated.

18          This matter is on the Court's calendar for a --

19  the defendant's entry of a plea of guilty to the Information

20  that was filed on August 25th of 2020.  The plea is being

21  offered pursuant to a plea agreement that was filed on

22  August 25th and appears as docket No. 9.

23          The defendant has filed his consent to proceed by

24  video this morning.  That consent was filed on September 23rd

25  and appears as docket No. 16.  And the Court has made the

1  required CARES Act findings on September 25th in

2  document No. 18.

3          The plea agreement filed on August 25th will be

4  incorporated and made a part of this proceeding as if the

5  entire agreement had been read into the record.

6          Let me ask counsel for Mr. Goldman, do you object

7  to the prosecutor rather than the Court advising your client of

8  the elements of the offense, penalties for the offense to which

9  he offers his plea of guilty, the provisions of the plea

10 agreement relating to your client's waiver of his right to

11 appeal, and the constitutional rights that your client will be

12 giving up by pleading guilty this morning?

13          MR. MEISTER:  Thank you, Your Honor.  No

14 objection.

15          THE COURT:  All right.  Mr. Goldman, before I

16 accept your plea of guilty, I must satisfy myself that you have

17 been fully informed of your rights and that you fully

18 understand both your rights and the nature of this proceeding.

19 In order to do so, I'm going to ask you a series of questions

20 this morning, and you will be advised of certain rights.  If at

21 any point you do not understand a question I have asked or a

22 statement that has been made, please tell me, and I will try to

23 make it clearer for you.

24          Before we begin, I'm going to ask the courtroom

25 deputy to administer the oath to Mr. Goldman.

1           THE CLERK:  Mr. Goldman, do you solemnly swear to

2   answer truthfully the questions the Court will ask you, so help

3   you God?

4           THE DEFENDANT:  Yes.

5           THE COURT:  All right.  Sir, do you understand

6   that you are now under oath and, if you answer any of my

7   questions falsely, your answers may be used against you later

8   in another prosecution for perjury or for the making of a false

9   statement?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  What is your true and correct full

12  name?

13          THE DEFENDANT:  Morris Roland Goldman.

14          THE COURT:  How old are you, sir?

15          THE DEFENDANT:  57.

16          THE COURT:  How many years of school have you

17  completed?

18          THE DEFENDANT:  I'm not sure the number, but I

19  have a Master's degree in public administration.

20          THE COURT:  Are you a United States citizen?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Have you taken any medication, drugs,

23  or alcohol within the last 72 hours?

24          THE DEFENDANT:  A couple glasses of wine last

25  night.

```
 1                    THE COURT:  And do you suffer from any mental

 2    condition that would prevent you from understanding fully the

 3    charge against you or the consequence of any guilty plea you

 4    may enter to the charge?

 5                    THE DEFENDANT:  No, sir.

 6                    THE COURT:  Is there any reason at all why we

 7    can't go forward this morning in taking your plea of guilty?

 8                    THE DEFENDANT:  No, Your Honor.

 9                    THE COURT:  I'm going to ask counsel have you had

10    an opportunity to speak with your client prior to this

11    proceeding?

12                    MR. MEISTER:  Yes, Your Honor.

13                    THE COURT:  Do you have any reason to believe

14    that your client is not competent to enter his guilty plea at

15    this time?

16                    MR. MEISTER:  I do not.

17                    THE COURT:  Is there any reason at all why we

18    can't go forward this morning in taking your client's guilty

19    plea?

20                    MR. MEISTER:  There is not.

21                    THE COURT:  Is it your opinion your client is in

22    full possession of his faculties?

23                    MR. MEISTER:  That is my opinion.

24                    THE COURT:  All right.  Now, Mr. Goldman, you

25    have been charged in the single-count Information with a
```

1   violation of Title 18 United States Code Section 371 which is a

2   felony.  I'm going to ask the prosecutor to tell us what the

3   elements of the charge that is alleged in the Indictment are.

4                   MR. JENKINS:  Yes, Your Honor.  For the record,

5   he's charged by Information and the count -- sole count in

6   violation of Title 18 United States Code Section 371, the

7   elements are as follows:

8                   First, beginning in or around June 2016 and

9   ending on or about November 2018, there was an agreement

10  between two or more persons to commit at least one crime that

11  is charged in the Indictment;

12                  Defendant became a member of the conspiracy

13  knowing of at least one of its objects and intending to help

14  accomplish it;

15                  One of the members of the conspiracy performed at

16  least one overt act for the purpose of carrying out the

17  conspiracy.

18                  For a person to be guilty of federal program

19  bribery in violation of Title 18 United States Code

20  Section 666(a)(2), the following must be true:

21                  First, Jose Huizar was an agent of a local

22  Government;

23                  Second, defendant corruptly gave, offered, or

24  agreed to give anything of value to Jose Huizar;

25                  Three, defendant intended to influence or reward

1    Jose Huizar in connection with any business transaction or

2    series of transactions of the local government involving

3    anything of value of $5,000 or more; and,

4                   Four, the local government received in any

5    one-year period benefits in excess of $10,000 under a federal

6    program involving a grant, contract, subsidy, loan, guarantee,

7    insurance, or other form of federal assistance.

8                   For a person to be guilty of mail fraud including

9    through the deprivation of honest services in violation of

10   Title 18 United States Code Sections 1341 and 1346, the

11   following must be true:

12                  First, defendant devised or knowingly

13   participated in a scheme or plan to deprive the citizens of

14   Los Angeles of their rights of honest services;

15                  Second, the scheme or plan consisted of a bribe

16   or kickback in exchange for Jose Huizar's services;

17                  Third, Jose Huizar owed a fiduciary duty to the

18   City;

19                  Fourth, defendant acted with the intent to

20   defraud by depriving the City of its right of honest services;

21                  Fifth, defendant's act was material, that is, it

22   had a natural tendency to influence or was capable of

23   influencing the City's acts; and,

24                  Six, defendant used or caused someone to use the

25   mail to carry out or attempt to carry out the scheme or plan.

```
 1                    THE COURT:  All right.  Mr. Goldman, do you
 2    understand the nature of the charge pending against you?
 3                    THE DEFENDANT:  Yes, Your Honor.
 4                    THE COURT:  Has your attorney discussed with you
 5    each of the elements of the offense?
 6                    THE DEFENDANT:  Yes, Your Honor.
 7                    THE COURT:  Do you have any questions about the
 8    charge pending against you?
 9                    THE DEFENDANT:  No, Your Honor.
10                    THE COURT:  Counsel, I have a conformed copy of
11    your client's waiver of Indictment that was filed on
12    September 23rd of 2020.  It appears as docket No. 23.  And the
13    copy that I have reflects that you and your client signed that
14    waiver of Indictment on September 18th and that the waiver of
15    Indictment was accepted by Magistrate Judge Donahue on
16    September 23rd of 2020.
17                    Did your client waive his right to be charged by
18    a grand jury Indictment before the magistrate judge, and was
19    your client's waiver of Indictment accepted by the magistrate
20    judge?
21                    MR. MEISTER:  Yes to both of those questions,
22    Your Honor.
23                    THE COURT:  All right.  Unless counsel object, I
24    will find, based upon the defendant's waiver of Indictment that
25    was accepted by Magistrate Judge Donahue on September 23rd,
```

1    that the defendant's waiver of his right to be charged by an

2    Indictment of the grand jury is knowingly and voluntarily made.

3         Does the Government have any objection to the

4    Court's finding?

5         MR. JENKINS:  No, Your Honor.

6         THE COURT:  Does the defendant have any objection

7    to the Court's finding?

8         MR. MEISTER:  No, Your Honor.

9         THE COURT:  All right.  Mr. Goldman, in addition

10   to the right to be charged by a grand jury, you have a number

11   of other constitutional rights that you will be giving up if

12   you plead guilty this morning, and I'm going to ask the

13   prosecutor to advise you of those constitutional rights.

14        MR. JENKINS:  Yes, Your Honor.  By pleading

15   guilty here today, the defendant gives up the following rights:

16        The right to persist in a plea of not guilty;

17        The right to a speedy and public trial by jury;

18        The right to be represented by counsel and, if

19   necessary, have the Court appoint counsel at trial.  Defendant

20   understands, however, that defendant retains the right to be

21   represented by counsel and, if necessary, have the Court

22   appoint counsel at every other stage of the proceeding;

23        The right to be presumed innocent and to have the

24   burden of proof placed on the Government to prove defendant

25   guilty beyond a reasonable doubt;

1          The right to confront and cross-examine witnesses

2    against defendant;

3          The right to testify and to present evidence in

4    opposition to the charges including the right to compel the

5    attendance of witnesses to testify;

6          The right not to be compelled to testify and, if

7    defendant chose not to testify or present evidence, to have

8    that choice not be used against defendant.

9          In addition, defendant gives up any and all

10   rights to pursue any affirmative defenses, 4th Amendment or

11   5th Amendment claims, and other pretrial motions that could be

12   filed.

13          THE COURT:  All right.  Mr. Goldman, have you

14   discussed each of these rights with your attorney?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  Do you understand that you have these

17   rights and, if you enter a plea of guilty and I accept your

18   guilty plea, you will be giving up the right to a trial and the

19   other rights the prosecutor just described to you?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Do you give up each of these rights?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  Counsel, are you satisfied that each

24   of your client's waivers are knowingly and voluntarily made,

25   and do you join in and concur in each of the waivers made by

1  your client?

2              MR. MEISTER:  Yes, Your Honor, I join.

3              THE COURT:  All right.  Now, as we discussed

4  earlier, you have been charged with a violation of

5  18 United States Code Section 371.  Have you been advised of

6  the maximum penalty provided by law for the offense to which

7  you now offer your plea of guilty?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  I'm going to ask the prosecutor to

10 tell us what the statutory maximum punishment is for this

11 offense including the authorized term of supervised release,

12 all applicable fines and special assessments, whether or not

13 this charge carries a mandatory minimum sentence, and whether

14 or not a restitution order is available in this case.

15             MR. JENKINS:  Yes, Your Honor.  Defendant

16 understands that the statutory maximum sentence the Court can

17 impose for a violation of Title 18 United States Code

18 Section 371 is five years imprisonment, a three-year period of

19 supervised release, a fine of $250,000 or twice the gross gain

20 or gross loss resulting from the offense, whichever is

21 greatest, and a mandatory special assessment of $100.

22             There is no mandatory minimum penalty, and there

23 is no compulsory restitution.

24             THE COURT:  All right.  Mr. Goldman, do you

25 understand there is no parole and, if you are sentenced to

1    prison, you will not be released on parole?

2                    THE DEFENDANT:  Yes, Your Honor.

3                    THE COURT:  You may be subject to supervised

4    release for a number of years after your release from any

5    prison sentence.  Do you understand that, if you violate the

6    terms and conditions of supervised release, you can be given

7    additional time in prison?

8                    THE DEFENDANT:  Yes, Your Honor.

9                    THE COURT:  Now, you will be sentenced under the

10   Sentencing Reform Act of 1984.  However, I want to advise you

11   that I'm not required to impose a sentence within the range

12   established by the United States Sentencing Guidelines.  The

13   guidelines are now merely advisory, and I am free to exercise

14   my discretion to impose any sentence I deem appropriate up to

15   the maximum sentence set by statute for the crime of

16   conviction.

17                   Do you understand that?

18                   THE DEFENDANT:  Yes, Your Honor.

19                   THE COURT:  Do you also understand that in

20   determining your sentence I will calculate and consider the

21   applicable sentencing guideline range, any possible upward or

22   downward departures authorized under the sentencing guidelines,

23   and certain other statutory sentencing factors set forth in

24   Title 18 United States Code Section 3553(a)?

25                   Do you understand that?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Have you discussed the advisory

3   sentencing guidelines and other factors that I will consider in

4   determining your sentence with your attorney?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Has your attorney explained how the

7   sentencing guidelines and other factors will be used to

8   determine your sentence?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Do you understand that I will not be

11   able to determine the applicable sentencing guideline range or

12   the actual sentence for your case until a presentence report

13   has been prepared by the probation department and you and the

14   Government have an opportunity to review the report and file

15   any objections you may have concerning the report?

16          Do you understand that?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Do you understand that, for all of

19   these reasons, neither your attorney nor I can tell you today

20   what your sentence will be?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Do you understand that, if I impose a

23   sentence that is more severe than you anticipate, you will not

24   be able to withdraw your guilty plea?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Do you understand the maximum

2   sentence that you can receive in the event I accept your guilty

3   plea?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Do you have any questions regarding

6   the potential sentence that you may receive?

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  Now, a plea agreement has been filed

9   in this case.  Have you read the plea agreement and discussed

10  all of the terms of your plea agreement with your attorney?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Did you sign the plea agreement?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Did you understand the plea agreement

15  and all of its terms?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Would you like to have any additional

18  time to discuss any part of the plea agreement with your

19  attorney?

20         THE DEFENDANT:  No, Your Honor.

21         THE COURT:  Now, as part of the plea agreement,

22  the Government may have agreed to make certain recommendations

23  or agreements concerning your sentence, but I want you to

24  understand I'm not a party to this agreement and I'm not going

25  to be bound by those sentencing recommendations which means

1  that, if I impose a sentence that is more severe than you

2  anticipate under your plea agreement, you will not be able to

3  withdraw your guilty plea.

4           Do you understand this?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  Now, paragraphs 18 and 19 of your

7  plea agreement contain a waiver of your right to appeal, and

8  I'm going to ask the prosecutor to read into the record the

9  provisions of those paragraphs, and then I'm going to ask you

10 some questions about your appellate waiver.

11          MR. JENKINS:  Yes, Your Honor.

12          Defendant understands that, with the exception of

13 an appeal based on a claim that defendant's guilty plea was

14 involuntary, by pleading guilty, defendant is waiving and

15 giving up any right to appeal defendant's conviction on the

16 offense to which defendant is pleading guilty.

17          Defendant understands that this waiver includes

18 but is not limited to arguments that the statute to which

19 defendant is pleading guilty is unconstitutional and any and

20 all claims that the statement of facts provided in the

21 attachment is insufficient to support defendant's plea of

22 guilty.

23          In addition, defendant agrees that, provided the

24 Court imposes a total term of imprisonment of no more than

25 30 months, defendant gives up the right to appeal all of the

1  following:

2              A, the procedures and calculations used to

3  determine and impose any portion of the sentence;

4              B, the term of imprisonment imposed by the Court;

5              C, the fine imposed by the Court provided it is

6  within the statutory maximum;

7              D, to the extent permitted by law, the

8  constitutionality or legality of defendant's sentence provided

9  it is within the statutory maximum;

10              E, the term of probation or supervised release

11  imposed by the Court provided it is within the statutory

12  maximum;

13              And any of the following conditions of probation

14  or supervised release, supervised release imposed by the Court,

15  the conditions set forth in General Order 20-04 of this Court,

16  the drug testing conditions mandated by Title 18 United States

17  Code Sections 3563(a)(5) and 3583(d).

18              THE COURT:  All right.  Mr. Goldman, do you

19  understand that, by entering into this plea agreement and

20  pleading guilty this morning, you have agreed to give up your

21  right to appeal in accordance with the terms of your plea

22  agreement?

23              THE DEFENDANT:  Yes, Your Honor.

24              THE COURT:  Did you discuss waiving your right to

25  appeal with your attorney?

 1          THE DEFENDANT:  Yes, Your Honor.

 2          THE COURT:  Based on the conversation with your

 3   attorney and having considered the matter, do you wish to give

 4   up your right to appeal on the terms and conditions set forth

 5   in your plea agreement?

 6          THE DEFENDANT:  Yes, Your Honor.

 7          THE COURT:  Counsel, are you satisfied your

 8   client's waiver of his appellate rights is knowingly and

 9   voluntarily made, and do you join in and concur in your

10   client's decision to waive his right to appeal?

11          MR. MEISTER:  I do, Your Honor, and I join.

12          THE COURT:  All right.  Mr. Goldman, do you

13   understand that your guilty plea may deprive you of valuable

14   government benefits and valuable civil rights such as the right

15   to vote, the right to hold public office, the right to serve on

16   a jury, and the right to possess any kind of firearm or

17   ammunition?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  Have any promises, representations,

20   or guarantees been made to you in exchange for your plea of

21   guilty other than those that appear in your plea agreement?

22          THE DEFENDANT:  No, Your Honor.

23          THE COURT:  Has anyone made any threats or used

24   any force against you or any member of your family in order to

25   get you to plead guilty today?

1           THE DEFENDANT:  No, Your Honor.

2           THE COURT:  Are you pleading guilty voluntarily

3    and of your own free will?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  Other than what is contained in your

6    written plea agreement and other than a general discussion with

7    your attorney of the sentencing guidelines and other factors

8    that I will consider in determining your sentence, has anyone

9    made you any promises of leniency, a particular sentence,

10   probation, or any other inducement of any kind in order to get

11   you to plead guilty?

12          THE DEFENDANT:  No, Your Honor.

13          THE COURT:  Have you been told by anyone what

14   specific sentence the Court will impose in the event I accept

15   your plea of guilty?

16          THE DEFENDANT:  No, Your Honor.

17          THE COURT:  Now, I'm going to ask the prosecutor

18   to make an offer of proof as to what facts the Government would

19   prove on the single-count Information if this case went to

20   trial.  I'm going to ask you to listen very carefully because

21   I'm going to ask you questions about what the prosecutor says

22   in his offer of proof.

23          MR. JENKINS:  Yes, Your Honor.  And with the

24   Court's indulgence, we would like to read attachment A which is

25   the factual basis which, for the record, is 21 pages and

1    initialled by the defendant on each page.

2                    THE COURT:  All right.  I will permit the

3    reading.  Before you do so, I want to make sure that

4    Mr. Goldman and his counsel, that they each have reviewed the

5    factual basis and the factual basis is accurate; is that

6    correct?

7                    MR. MEISTER:  We have, Your Honor.  It is.

8                    THE COURT:  All right.  Mr. Jenkins, you may go

9    ahead and make your offer of proof.

10                   MR. JENKINS:  Thank you, Your Honor.

11                   Defendant Morris Roland Goldman, also known as

12   Morrie Goldman, was a registered lobbyist and consultant in the

13   City of Los Angeles including for Company M which had a

14   development project in the City.  Defendant Goldman was also a

15   close associate of and fundraiser for Jose Huizar, the council

16   member of Council District 14 and agent of the City.  The City

17   government received more than $10,000 per fiscal year in funds

18   from the United States in the form of grants, contracts,

19   subsidies, loans, guarantees, insurance, and other forms of

20   federal assistance.

21                   Beginning no later than June 2016, Huizar and

22   others planned to have Relative A-1 succeed him as council

23   member for CD-14 in order to maintain a political stronghold in

24   the City.  Huizar's last term as the CD-14 council member was

25   set to expire at the end of 2020 when he was no longer eligible

1    for re-election.

2              In furtherance of this plan, Defendant Goldman,

3    Huizar, George Esparza, and others established a Political

4    Action Committee, or PAC, known as PAC A that was registered as

5    a, quote, "general purpose," unquote, PAC purported to benefit

6    a broad array of candidates and causes but was, in fact,

7    primarily intended to benefit Relative A-1's campaign.

8              Huizar on numerous occasions expressed to

9    Defendant Goldman that it was important to accumulate a

10   significant amount of financial distributions early on in order

11   to scare off potential candidates contemplating running against

12   Relative A-1.  At Huizar's request and direction,

13   Defendant Goldman thereafter solicited and pressured real

14   estate developers with projects pending before the City to

15   contribute to PAC A in exchange for favorable treatment of

16   their projects by Huizar and the City including in the Planning

17   and Land Use Management, or PLUM, Committee, Economic

18   Development Committee, and city council.

19             Between in or about June 2016 and in or about

20   November 2018 in Los Angeles County within the Central District

21   of California, Defendant Goldman, while employed by Company M

22   as its lobbyist and acting to benefit Company M, agreed with

23   co-conspirators Huizar and Executive M, an executive of

24   Company M, among others to knowingly and intentionally commit

25   offenses against the United States, namely, bribery concerning

1    programs receiving federal funds and mail fraud including

2    through the deprivation of honest services.

3                Specifically, in or about September 2018,

4    Defendant Goldman agreed with Huizar and Executive M that

5    Company M would contribute an additional $50,000 to PAC A to

6    benefit Relative A-1's campaign in exchange for official acts

7    from Huizar, namely, to vote against a union appeal on

8    Company M's project in the PLUM Committee.

9                Defendant Goldman entered into this agreement

10    knowing of the agreement's objects and intending to help

11    accomplish it.  In furtherance of this agreement,

12    Defendant Goldman and co-conspirators Huizar and Executive M,

13    among others, committed various acts described below:

14                Defendant Goldman's role in PAC A.  On

15    May 2nd, 2017, in a telephone call, Defendant Goldman and

16    Esparza discussed the strategy to use Political Action

17    Committee to financially benefit Relative A-1's campaign.

18    Specifically, Defendant Goldman requested a dinner with Huizar

19    to talk about some political contribution stuff and the

20    committee he wants to open.  Defendant Goldman told Esparza

21    that Huizar Associate 3 and Defendant Goldman wanted to talk to

22    Huizar about some ideas on what to do with the PAC and Huizar

23    wants to do for Relative A-1.  Defendant Goldman and Esparza

24    then discussed that Huizar no longer wanted to use PAC B with

25    Huizar Associate 2 but instead wanted his own PAC.

1  Defendant Goldman then stated, "We have some ideas on how to

2  structure it, and we wanna talk to him about it."

3          On May 18, 2017, Defendant Goldman and Esparza

4  continued discussing establishing a PAC to benefit

5  Relative A-1's campaign.  Specifically, Defendant Goldman told

6  Esparza, "What we have to do is open a general purpose

7  committee."  Defendant Goldman went on to explain, "You and I

8  can run it, but we need to have someone who can be the face of

9  it."  Defendant Goldman stated, "I would envision Jose Huizar

10  saying, 'Let's have ten people at 10,000 bucks each, you know,

11  once or twice a year, and then in three years closer to the

12  CD-14 election you're talking, you know, almost a million

13  dollars.'"

14          Defendant Goldman reiterated that they needed

15  "someone who can just sort of be the face of it so that it's

16  not you or me, and then you and I can run it."

17  Defendant Goldman then explained that they needed to have

18  someone else raise money into the PAC as well and make some

19  additional expenditures adding, "You follow?  So it's not just

20  Relative A-1.  It's not just Jose Huizar."  Defendant Goldman

21  explained, "Relative A-1 gets the lion's share of it, and

22  Jose Huizar would do the lion's share of the fundraising, but

23  it's not just Jose Huizar for Relative A-1."  Defendant Goldman

24  then told Esparza he had people ready to start contributing

25  now.

1          During the same phone call about political

2    contributions to help Huizar and Relative A-1,

3    Defendant Goldman emphasized to Esparza that he needed help

4    from the City, specifically, the City's digital sign ordinance,

5    to move on the 30th because it would affect one of his

6    developer clients adding, "I like this client.  They pay a lot

7    of money."

8          On May 22nd, 2017, in a telephone call,

9    Defendant Goldman and Esparza discussed an upcoming meeting

10   with Huizar for one of Defendant Goldman's developer clients.

11   Defendant Goldman noted, "It's a relationship thing.  It's very

12   consistent with the sort of -- the long-term Morrie,

13   George Esparza, Jose Huizar plan."

14          On May 25, 2017, in a telephone call

15   Defendant Goldman told Esparza, "I talked to Jose Huizar

16   yesterday, and so we're green-lighted," referring to the idea

17   of establishing a PAC to benefit Relative A-1.

18   Defendant Goldman then told Esparza, "We need to find somebody

19   in the district, a very good close either family friend or

20   relative, to serve in the role of treasurer or the controlling

21   person, you know, on paper."  Esparza responded, "So I'll ask

22   Huizar too who he may have in mind.  Okay."

23          On June 2nd, 2017, in a telephone call,

24   Defendant Goldman, Huizar, and Relative A-1 discussed

25   establishing a PAC to support Relative A-1's campaign.

1    Defendant Goldman explained, "The PAC, that's going to be

2    strictly political money.  And, you know, two years from now or

3    three years there will be a million dollars in there.  You

4    won't be able to direct it, but there will be people, you know,

5    who are like-minded."

6              On or around June 22nd, 2017, Defendant Goldman

7    met with Huizar, Esparza, and Justin Kim and discussed

8    establishing a PAC to raise money for Relative A-1's campaign.

9    During this meeting, Huizar suggested having Kim find an

10   associate to serve as the face of the PAC to disguise Huizar's

11   involvement and the PAC's connection to CD-14.

12             On June 22nd, 2017, in a telephone call,

13   Defendant Goldman and Huizar discussed the PAC to benefit

14   Relative A-1's campaign, specifically the need to install

15   someone to run the PAC that Huizar would be able to covertly

16   control or influence.  Defendant Goldman stated that,

17   "Regarding the treasurer for the PAC, I just really want to

18   again encourage you to think about someone from your personal

19   circle."  Huizar responded, "Yeah, no.  I agreed to that.  You

20   made a very good point which is, look, if I go with somebody

21   that Justin Kim recommends, I thought it was cool because it's

22   more distance from me; right?  Some Korean.  Who's gonna know

23   some Korean, some random Korean?  What are they doing

24   fundraising over here?  It must be an independent assistant

25   from Huizar.  But the more I thought about it, I think there's

1  a lot more benefit to have someone who's close to me because,

2  you're right.  What if, like, Justin Kim and I have a falling

3  out and there's a million dollars standing in committee?  I'm

4  supposed to have not anything to do with it.  Supposedly I

5  don't have anything to do with it so."  Defendant Goldman

6  responded, "I mean, in an ideal world, I mean, we're all

7  friends.  We're all loyal.  But, you know, things happen.  I

8  just want to make sure you're protected."

9          Defendant Goldman and Huizar then discussed

10  asking one of Defendant Goldman's developer clients for seed

11  money for PAC.  Defendant Goldman stated, "He's my client, but

12  you're my friend.  And we have an end game."  Defendant Goldman

13  and Huizar agreed to seed the PAC early.

14          In the subsequent months, Defendant Goldman and

15  Huizar had regular discussions regarding their strategy for

16  opening PAC A and targeting developers with projects pending

17  before the City to contribute to Relative A-1's campaign.

18          On October 18, 2017, a political account

19  supervisor sent an initial statement of organization for PAC A

20  to the California Secretary of State by U.S. Mail.

21  Defendant Goldman was listed as an additional principal officer

22  of the PAC.

23          Beginning in or around April 2018,

24  Defendant Goldman, Huizar, and Huizar Associate 3 met regularly

25  to discuss the fundraising plan for Relative A-1's campaign.

1   Specifically, on March 26, 2018, Huizar sent a text message to

2   Defendant Goldman writing, "We should meet every two weeks to

3   discuss progress on PAC.  Me, you, and Huizar Associate 3.

4   What you think?  Can I have a CD-14 staffer set something up?"

5   On March 29, 2018, Huizar instructed his staffer in an e-mail,

6   "Please schedule a meeting with me and Morrie Goldman and

7   Huizar Associate 3, a meeting every two weeks to go over PAC.

8   They will know what that's about."

9          During their regular meetings to discuss the

10  PACs, among other things, Huizar, Defendant Goldman, and

11  Huizar Associate 3 created and discussed a document entitled

12  "fundraising plan" which tracked developers, contribution

13  amounts, and the designated person responsible for soliciting

14  the contributions which included Huizar, Defendant Goldman, and

15  Huizar Associate 3, among others.  The fundraising plan

16  document included a section titled "Morrie" for tracking

17  contributions to PAC A and a separate action titled "Huizar

18  Associate 2" for tracking contributions to PAC B.

19          On April 4, 2018, Huizar sent an e-mail to

20  Defendant Goldman and Huizar Associate 3 writing, "Good meeting

21  yesterday.  Morrie Goldman, please have accounting of PAC A for

22  the next time we meet.  My records show there are about 55K in

23  account.  Please bring all income and what expenses we have had

24  to date."  Huizar often asked for an accounting of PAC A, and

25  Defendant Goldman understood that Huizar wanted to control the

1    expenditures of PAC A to benefit Relative A-1's campaign.

2                       On April 13, 2018, Huizar sent an e-mail to

3    Defendant Goldman writing, "Hey, Morrie, attached is

4    fundraising plan I have.  See you Monday.  I was gonna propose

5    that you and I just meet on this plan in future, and we can

6    just nudge Huizar Associate 3 to collect.  He just has two,

7    although large, targets to collect."  The attachment titled

8    "PAC A" included a list of developers and individuals, amounts,

9    notes, and the individual responsible for soliciting the

10   contribution.

11                      Defendant Goldman had eight targets for

12   contributions totalling $275,000 including developers with

13   projects pending before the City and Huizar.  Huizar had twelve

14   targets totaling $680,000, and Huizar Associate 3 had two

15   targets totaling $200,000.  In total, the fundraising plan had

16   $1,155,000 in targeted contributions for PAC A to benefit

17   Relative A-1's campaign.  Subsequently, Huizar sent a text

18   message to Defendant Goldman writing, "Just sent you e-mail on

19   PAC and targets."

20                      Project M bribery scheme.  Beginning in

21   approximately 2014, Company M employed Defendant Goldman as a

22   lobbyist to facilitate a relationship with Huizar whereby

23   Company M would request Huizar's assistance on a number of

24   issues related to Project M and provide financial contributions

25   at Huizar's request.  During Defendant Goldman's employment as

1    Company M's lobbyist and at all times listed below in this

2    factual basis, Defendant Goldman acted as an agent of Company M

3    and for the benefit of Company M.

4                    $25,000 contribution to PAC B.  In or around

5    August 2016, Defendant Goldman and Executive M had discussions

6    via text message regarding the general plan amendment for

7    Project M.  Specifically, on August 2nd, 2016, Executive M

8    wrote, "We have a real problem.  The planning department did

9    not approve our GPA again.  Let's talk ASAP in the morning."

10   On August 11, 2016, Defendant Goldman wrote to Executive M, "I

11   got the meeting request in.  How we doing on the GPA motion,

12   et cetera?  Spoke to Huizar.  We will meet next Thursday, and

13   he will introduce the motion to initiate."

14                   On August 18, 2016, Huizar, Defendant Goldman,

15   and Executive M met at Huizar's city hall office to discuss

16   Project M.  At the meeting, Defendant Goldman and Executive M

17   asked Huizar to file a motion to initiate a general plan

18   amendment for Project M.  Huizar agreed to initiate the general

19   plan amendment either by exerting pressure on the planning

20   department to do so or by filing a motion.

21                   In September 2016, Huizar asked Defendant Goldman

22   for contributions to PAC B from Defendant Goldman's clients

23   with projects pending in CD-14 including from Executive M on

24   behalf of Project M in connection with a homeless initiative

25   that was on the ballot in November 2016, Measure HHH.

1     Defendant Goldman agreed to convey the request to his clients.

2                On October 13, 2016, Esparza sent a text message

3     to Defendant Goldman providing the information for PAC B and

4     adding, "According to my boss, Huizar, that's for another

5     developer and Company M.  He said he spoke to you about it."

6                On October 13, 2016, Defendant Goldman sent an

7     e-mail to Executive M passing on account information for PAC B

8     he received from Esparza.  Executive M replied, "Timing and

9     amount?"  Defendant Goldman then wrote, "25K as soon as

10    possible."

11               On October 14, 2016, Defendant Goldman sent an

12    e-mail to Executive M attaching a remit form for PAC B and

13    writing, "Huizar is asking that contributions be directed to

14    this committee.  Please hold off if you are processing a

15    contribution to the other primary committee."

16    Defendant Goldman conveyed this to Executive M because he

17    understood Huizar wanted the contribution to more directly

18    benefit Huizar which could be better achieved by the money

19    going to PAC B rather than the official Measure HHH campaign

20    committee.

21               On October 26, 2016, Executive M wrote to

22    Defendant Goldman in a text message, "I should have checks by

23    tomorrow.  All I need is the letter.  Would it be worth setting

24    up a quick drink or coffee with Jose when we deliver?  Could be

25    good to talk big picture, et cetera."  Defendant Goldman

1    understood that Executive M wanted to discuss the merits of

2    Project M and seek Huizar's assistance with the project when

3    delivering the $25,000 to PAC B as Huizar had requested.

4              On October 31st, 2016, Defendant Goldman sent a

5    text message to Esparza writing, "When can I get Executive M in

6    with Jose Huizar to deliver the checks?"  Defendant Goldman was

7    referring to the $25,000 contribution to PAC B which Huizar had

8    requested and Executive M's request to discuss Project M with

9    Huizar at the same time.

10             THE COURT:  Mr. Jenkins, just hold off a minute.

11             Mr. Meister, are you still on?  Have we lost

12   counsel?  Why don't we hold off.

13             MR. MEISTER:  Can you hear me?

14             THE COURT:  We can hear you.  We just don't have

15   your video.  So we will proceed by audio.

16             MR. MEISTER:  All right.  Thank you.

17             THE COURT:  All right.  So you can proceed.  I

18   believe you were -- you had concluded paragraph 26, and you

19   were about to move on to paragraph 27; correct?

20             MR. JENKINS:  That is correct, Your Honor.

21             THE COURT:  All right.  Then you may proceed.  We

22   have everybody.

23             MR. MEISTER:  Just for the record, Your Honor, I

24   have received an uninterrupted signal.  I have heard

25   everything, and I didn't know you couldn't see me.

1          THE COURT:  All right.  Well, the video just went

2    out; so I wanted to confirm that you could hear everything.  So

3    we will proceed.

4          MR. MEISTER:  Thank you.

5          MR. JENKINS:  Thank you, Your Honor.

6          Additional $25,000 contribution to PAC B.  On

7    February 15, 2017, Huizar and Defendant Goldman met for lunch

8    in downtown Los Angeles to discuss various projects.  At the

9    lunch, Huizar asked Defendant Goldman for an additional $25,000

10   contribution to PAC B from Company M in connection with a

11   homelessness initiative that was on the ballot in March 2017,

12   Measure H.  Defendant Goldman agreed to and did convey the

13   request to Executive M.

14          On February 21st, 2017, Defendant Goldman

15   informed Esparza via text message that Executive M acknowledged

16   the conversation with Jose Huizar regarding Company M's

17   additional contribution to PAC B.

18          On February 24, 2017, Executive M sent an e-mail

19   to another Company M employee copying Defendant Goldman with

20   the subject line, "Questions regarding Huizar PAC," and

21   writing, "You can direct any specific questions on the PAC to

22   Morrie Goldman who is cc'd."

23          On or about March 2nd, 2017, Company M made a

24   $25,000 contribution to PAC B at Huizar's direction.

25          THE COURT:  All right.  Mr. Jenkins, hold on a

1    minute.  I want the record to reflect that we have defense

2    counsel back on video again.

3              You may proceed.

4              MR. JENKINS:  Thank you, Your Honor.

5              On March 20, 2017, Executive M sent an e-mail to

6    Defendant Goldman writing, "Do you think we are in a more

7    favored status with Jose Huizar compared to another developer?"

8    Defendant Goldman understood Executive M to be asking whether

9    Company M's contributions of $50,000 total to PAC B at Huizar's

10   request placed them in a favored status.  Defendant Goldman

11   understood the favored status to mean more likely to receive

12   favorable official acts from Huizar on Project M.

13             On May 5th, 2017, in a telephone call, Huizar and

14   Defendant Goldman discussed Company M's contribution to PAC B

15   at Huizar's request.  Huizar and Defendant Goldman found out

16   that PAC B publicly disclosed Company M as a top donor for a

17   Los Angeles city council candidate.  Defendant Goldman told

18   Huizar that "A reporter was asking who asked us, Company M, for

19   the donation, but we were not gonna respond to that."  Huizar

20   responded, "Thank you very much.  I appreciate that."

21   Defendant Goldman stated, "No.  Of course."  Defendant Goldman

22   then stated, "When I told George Esparza, I said, 'Look, my two

23   things that I gotta protect, you know, Company M and gotta

24   protect you, Huizar.'"  Huizar responded, "Yeah.  Gotcha.

25   Gotcha."  Huizar then stated, "We can't be sloppy about this

and trust, uh, Huizar Associate 2.  But, anyway, we will save

that conversation for tomorrow, okay?"  Among other things,

Defendant Goldman was concerned about the media finding out

that Huizar directed the $25,000 PAC B contribution by

Company M.

On May 9, 2017, Executive M sent an e-mail to

Defendant Goldman asking about a media inquiry regarding a

Company M campaign contribution to PAC B in support of a

Los Angeles City Council candidate.  Defendant Goldman

responded by e-mail reminding Executive M that the contribution

was an ask from Jose Huizar.

$25,000 contribution and additional $25,000

commitment to PAC A.  Beginning in around January 2018,

Defendant Goldman had conversations with Huizar and Executive M

regarding Project M's approval in the PLUM Committee and city

council.  Specifically, Company M wanted the City to approve

Project M with a 5 percent affordable housing requirement which

dictates how many units would be designated for low income

residents while Huizar initially insisted on 11 percent

affordable housing.

The higher the percentage of units were

designated for low income residents, the less profit Company M

would obtain.  Executive M was concerned he would suffer

significant professional consequences, including the loss of

his job with Company M, if Project M was not approved.  So he

1   asked for Defendant Goldman's help because Executive M could

2   not get through to Huizar.  Executive M also told

3   Defendant Goldman that, if Project M did not obtain its

4   preferred affordable housing requirements, it would threaten

5   the viability of Project M altogether.

6            On January 8, 2018, Huizar and Defendant Goldman

7   had a discussion via text message regarding Project M and

8   Company M's willingness to contribute to their newly

9   established PAC A to benefit Relative A-1's campaign.

10  Specifically, Huizar wrote, "Let's do the PAC stuff later this

11  week.  See you there at 6:00.  What's purpose of tonight's

12  meeting?  Are they, Company M, gonna help with PAC?"

13  Defendant Goldman replied, "Executive M wants to talk about

14  Project M and see if you're comfortable with the height and

15  affordability levels."  Huizar answered, "Are they gonna help

16  with PAC?"  Defendant Goldman replied, "I'm sure they will.

17  However, as your friend, let's discuss this in a different text

18  thread."

19            Defendant Goldman understood that Huizar was

20  conditioning his official assistance on Project M, specifically

21  approvals related to affordability and height, on Company M's

22  financial support for PAC A which Defendant Goldman knew was

23  illegal.  Defendant Goldman was warning Huizar not to

24  explicitly document that understanding in a text message thread

25  because it was incriminating.

1          On February 23rd, 2018, Huizar and

2    Defendant Goldman had a discussion via text message regarding

3    PAC A.  Specifically, Defendant Goldman wrote, "Are you

4    checking the Confide app for texting on your iPhone?"  Huizar

5    replied, "I never use it, but it is there.  I have no

6    messages."  Defendant Goldman wrote, "I was going to text you

7    about your meeting with PAC A's attorney.  Wanted to see if we

8    got any clarification.  Confide is good for texting because it

9    is like Snapchat.  Message disappears."

10         On March 1st, 2018, Defendant Goldman had a

11   meeting with Huizar.  During the meeting Defendant Goldman and

12   Huizar discussed Company M's contributions to PAC A.

13   Specifically, Huizar asked for a $50,000 contribution to PAC A

14   to be paid in two installments, $25,000 as soon as possible and

15   another $25,000 by the end of the year after the approval of

16   Project M.  Defendant Goldman understood that Huizar requested

17   two separate contributions so as not to draw addition to a

18   large contribution of $50,000 from Company M.

19   Defendant Goldman agreed to convey the request to Executive M.

20         On March 14, 2018, Defendant Goldman met with

21   Executive M and relayed Huizar's request to have Company M

22   contribute $50,000 to PAC A which Defendant Goldman explained

23   was designed to benefit Relative A-1's campaign for the CD-14

24   seat.  Executive M agreed.  Later that same day,

25   Defendant Goldman met with Huizar to discuss PAC A including

1    the fact that Executive M agreed to have Company M contribute

2    to PAC A.

3              On March 15, 2018, Defendant Goldman sent an

4    e-mail to Executive M with the subject line "PAC A" writing,

5    "This is the committee we previously discussed and attaching a

6    contribution form for PAC A."

7              On April 13, 2018, Huizar sent an e-mail to

8    Defendant Goldman attaching a document titled "PAC A" that

9    included, among other things, an entry for Company M for

10   $50,000 with the note, "B/4 June, two checks, two entities."

11   Defendant Goldman understood that Huizar requested two separate

12   checks from two separate entities so as to not draw attention

13   to a large $50,000 contribution from Company M.

14             On May 8, 2018, Defendant Goldman and Executive M

15   had a discussion via text message regarding Executive M's

16   significant concerns regarding Project M's progress and his

17   desire for Huizar or a CD-14 staffer to pressure other city

18   officials in the planning department to benefit Project M.

19   Specifically:

20             Executive M, "Very important that City

21   Staffer A-2 calls a planning department official letting them

22   know he supports the height, et cetera.  Please, please make

23   sure this happens prior."

24             Defendant Goldman, "Yes.  I have a call into

25   City Staffer A-2."

1          Executive M, "Critical.  Would be a huge issue

2    otherwise with those people attending.  Maybe Huizar would be

3    willing to call a planning department official."

4          Defendant Goldman, "Huizar is traveling.  Not

5    around this week."

6          Executive M, "Can't he put in a call?  I'm just

7    really concerned."

8          Defendant Goldman, "Me too.  That's why I sent

9    you the list of invited attendees.  It might be a good idea for

10   a consultant to join us."

11         Executive M, "Did you hound City Staffer A-2?"

12         Defendant Goldman, "Yes."

13         Executive M, "And why can't Huizar put in a call?

14   Takes five minutes."

15         Defendant Goldman, "He's in Caribbean on family

16   vacation.  I'd rather have the call come from City Staffer A-2.

17   He is in the weeds on the project."

18         Executive M, "Can he come to the meeting?"

19         Defendant Goldman, "He's not going to go to a

20   meeting in planning department."

21         City Staffer A-2, "Will let them know their

22   position and then make the changes in PLUM."

23         Executive M, "This would be a disaster if they

24   took a position to deny.  This meeting seems to be a really bad

25   idea now.  When does Jose Huizar get back?"

1          Defendant Goldman, "Spoke with City Staffer A-2.

2     He will speak with the planning department official and then

3     call me to report back prior to our meeting."

4          In or about June 2018, Company M made a $25,000

5     contribution to PAC A in two checks of 12,500 each from two

6     separate entities at Huizar's direction.

7          On June 14, 2018, the City Planning Commission

8     approved Project M allowing it to move forward to a hearing

9     before the PLUM Committee and ultimately city council.

10    However, the City Planning Commission imposed certain

11    conditions for approval including an affordable housing

12    requirement of 11 percent, very low income units that would

13    ensure a significant percentage of very low income individuals

14    would have an opportunity for housing at the project.

15          Additional $50,000 commitment to PAC A in

16    exchange for Huizar's help on Project M.  On August 9, 2018,

17    Defendant Goldman sent an e-mail to Executive M regarding

18    Project M's upcoming hearing before the PLUM Committee writing,

19    "We need to address the labor issue.  Seriously we need to take

20    the executive of a labor union off the chessboard."

21    Defendant Goldman and Executive M had discussed that the labor

22    union was an issue that could affect Project M's approval in

23    the PLUM Committee with the potential to create delays and

24    increase costs.  In addition, Executive M told

25    Defendant Goldman that requiring a union project labor

1    agreement threatened the viability of Project M resulting in

2    negative repercussions for Executive M personally including the

3    potential loss of his job.

4              On September 4, 2018, in an e-mail Executive M

5    asked Defendant Goldman, "Any updates on Huizar meeting?"

6    Defendant Goldman responded, "I'm having a one-on-one meeting

7    with Huizar, and you're number one on the agenda."

8              On September 4, 2018, Huizar met with

9    Defendant Goldman regarding the labor union issue Company M was

10   facing on Project M.  During the meeting, Defendant Goldman

11   requested on behalf of Executive M for Huizar to vote against

12   the labor union's appeal by approving Project M in the

13   PLUM Committee.  Huizar explained that voting against the labor

14   union, which he considered an ally, could have negative

15   ramifications on Relative A-1's campaign.

16             Defendant Goldman understood this to mean that

17   voting against the labor union may result in the labor union

18   opposing Relative A-1's election which would be a significant

19   blow to her chance of success.  Because of this risk, Huizar

20   told Defendant Goldman something to the effect that, if he were

21   to vote against the labor union in PLUM Committee, then

22   Company M would have to make it worthwhile.  Defendant Goldman

23   understood this to mean that Huizar expected a financial

24   benefit from Company M in exchange for his efforts with the

25   labor union.

1    On September 6, 2018, Defendant Goldman and

2    Executive M met to discuss Project M and resolving its labor

3    issue.  During the meeting, Defendant Goldman discussed with

4    Executive M that they needed to make it worthwhile for Huizar's

5    intervention with the labor union.  Executive M and

6    defendant -- excuse me -- Executive M and Defendant Goldman

7    agreed that Company M should offer to make an additional

8    $50,000 contribution to PAC A.  Company M had previously agreed

9    to contribute $50,000 and paid the first $25,000 installment in

10   June of 2018.  This additional $50,000 contribution would bring

11   the total agreed-upon contributions on behalf of Company M to

12   PAC A to $100,000 in exchange for Huizar's assistance with

13   Project M.

14   On September 6, 2018, Huizar and

15   Defendant Goldman met outside a restaurant in Boyle Heights to

16   discuss the new arrangement with Executive M.  At the meeting,

17   Defendant Goldman conveyed the offer of an additional $50,000

18   contribution to PAC A bringing the total to $100,000, and

19   Huizar agreed to accept the contribution in exchange for voting

20   to approve Project M over objections by the labor union.

21   Huizar also requested a private meeting with Executive M.

22   Later that day in a text message, Defendant Goldman asked

23   Executive M, "Can you do dinner with Huizar on Tuesday 9/25?"

24   On September 12, 2018, while Huizar was

25   negotiating the additional financial benefit he sought from

1    Executive M and Company M, Huizar used his official position as

2    a PLUM chair to postpone his committee's hearing on Project M

3    to October 2nd, 2018, thereby causing the project to be

4    delayed.

5                On September 24, 2018, in a text message

6    Defendant Goldman told Huizar, "We are meeting Executive M

7    tomorrow for dinner.  Do you still want a restaurant in

8    downtown Los Angeles, or would you like someplace a bit more

9    private?"

10               On September 24, 2018, in a text message

11   Defendant Goldman told Executive M, "Meeting is moved to

12   breakfast on 10/4 at 9:00 a.m."  Executive M replied, "But that

13   pushes our date.  This is a disaster."  Defendant Goldman

14   responded, "Yes.  It pushes the date.  It's going to get done."

15   Defendant Goldman and Executive M were discussing the private

16   meeting between Executive M and Huizar and its effect on

17   delaying the PLUM Committee hearing for Project M.

18               On September 26, 2018, in a text message

19   Defendant Goldman asked Executive M, "Any chance you can do

20   your one-on-one dinner with Huizar this Friday 9/28?"

21   Executive M replied, "Yes.  I'm assuming hearing date is the

22   same?"

23               On September 28, 2018, Huizar and Executive M had

24   a private meeting to discuss securing Huizar's support for

25   Project M, its approval in the PLUM Committee, and Company M's

1    support for Relative A-1's campaign.

2            On September 28, 2018, Huizar sent a text message

3    to Defendant Goldman writing, "Good meeting with Executive M.

4    He is willing to help Relative A-1 committee.  He will collect

5    from consultants/contractors.  We didn't ask amount.  Please

6    enlist him for your event and ask him to collect 15 to 20K for

7    your event."

8            Based on his conversations with Huizar and

9    Executive M, including this text message, Defendant Goldman

10   understood that Executive M and Huizar confirmed their

11   agreement related to the PAC A contribution at the dinner

12   Defendant Goldman facilitated.  Further, Huizar wanted

13   Defendant Goldman to have Executive M additionally collect

14   individual contribution accounts -- excuse me -- individual

15   contribution checks for Relative A-1's primary campaign

16   committee to deliver at the upcoming fundraiser

17   Defendant Goldman was hosting for her.

18           On October 2nd, 2018, Huizar used his official

19   position as the PLUM Committee chair to postpone his

20   committee's hearing on Project M to October 16, 2018.

21           On October 11, 2018, Huizar, Executive M,

22   Employee M, and Defendant Goldman attended a fundraiser for

23   Relative A-1 hosted by Defendant Goldman.  At the fundraiser,

24   Executive M had a manila envelope that he told

25   Defendant Goldman was for Huizar.  When Defendant Goldman asked

1    Executive M what was in the envelope, Executive M declined to

2    answer and instead told Defendant Goldman that Huizar would

3    tell Defendant Goldman if Huizar wanted him to know.

4              On October 13, 2018, Executive M sent a text

5    message to Defendant Goldman regarding the upcoming

6    PLUM Committee hearing for Project M asking, "Anyone else on

7    PLUM we should connect with?"  Defendant Goldman replied, "I

8    was thinking about it, but I really don't want to call

9    attention to it.  I would rather let Jose power play it

10   through."

11             On October 16, 2018, Huizar voted to deny the

12   union appeal and to approve Project M in the PLUM Committee

13   including accepting certain modifications requested by

14   Company M.  Specifically, the PLUM Committee accepted

15   Company M's preferred modifications to the affordable housing

16   restrictions thereby undoing the more stringent requirements

17   recommended by the City Planning Commission.

18             As a result of Huizar's approval in undoing the

19   CPC recommendations, Company M obtained significant reductions

20   to Project M's affordable housing requirements from 11 percent

21   very low income units to 6 percent moderate income units.  The

22   changes resulted in overall significant savings for Company M

23   which together with the denial of the labor union's appeal

24   resulted in, according to Executive M, saving the viability of

25   Project M.

45

1              That same day after the PLUM Committee approval
2     in a text message, Defendant Goldman told Executive M, "Let's
3     talk tomorrow.  I'm seeing Jose Huizar on Thursday; so I know
4     he will bring up follow-up on a few items."  Defendant Goldman
5     meant that Huizar would bring up Company M's commitment to
6     contribute the remaining $75,000 to PAC A.
7              On October 18, 2018, Huizar and Defendant Goldman
8     had a meeting at Huizar's residence.  Among other things,
9     Huizar brought up Company M's commitment to contribute to
10    PAC A.
11             On October 31st, 2018, Huizar voted to approve
12    Project M in city council.
13             On or around October 31st, 2018,
14    Defendant Goldman updated a document tracking commitments and
15    contributions made to PAC A.  Among other things, the document
16    had an entry for Company M with the figure $25,000 in the
17    column titled "paid" and $75,000 in the column titled
18    "committed."  In addition, in the comments column the entry for
19    Company M stated, "75K by December."  Defendant Goldman
20    understood this notation to represent Company M's commitment to
21    contribute an additional $75,000 to PAC A by the end of 2018
22    for a total of $100,000 to be paid to PAC A by Company M at
23    Huizar's request.
24             On November 1st, 2018, Defendant Goldman and
25    Executive M had a discussion via text message regarding

1  contributions to PAC A.  Specifically, Defendant Goldman wrote,

2  "Can we meet up next week and go through Huizar political

3  stuff?"  Defendant Goldman meant the $75,000 PAC contribution

4  to Company M -- excuse me -- the $75,000 PAC contribution

5  Company M had committed to Huizar in exchange for Huizar's now

6  successful help with Project M.

7            THE COURT:  All right.  Mr. Goldman, did you

8  understand everything the prosecutor said in his offer of

9  proof?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  Is everything that the prosecutor

12  said in his offer of proof about you and about your conduct and

13  intent true and correct?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Did you do what the prosecutor said

16  in his offer of proof?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  Are you pleading guilty because

19  you're in fact -- because you, in fact, did the acts charged in

20  the Information?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  Are you pleading guilty because

23  you're, in fact, guilty?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Counsel, have you reviewed the facts

1    of this case and the discovery that was provided to you by the

2    Government?

3                    MR. MEISTER:  I have, Your Honor.

4                    THE COURT:  Have you reviewed the facts of the

5    case and the discovery with your client?

6                    MR. MEISTER:  I have.

7                    THE COURT:  Have you advised your client

8    concerning the legality or admissibility of any statements or

9    confessions or other evidence the Government has against him?

10                   MR. MEISTER:  I have.

11                   THE COURT:  Is your client pleading guilty

12   because of any illegally obtained evidence in the possession of

13   the Government that you're aware of?

14                   MR. MEISTER:  None that I'm aware of.

15                   THE COURT:  Did you explore with your client any

16   possible defenses he may have?

17                   MR. MEISTER:  Yes.

18                   THE COURT:  Do you believe there is a factual

19   basis for the plea your client is entering?

20                   MR. MEISTER:  Yes.

21                   THE COURT:  Do you believe your client's plea is

22   being made freely and voluntarily with a full understanding of

23   the charge and the consequence of the plea?

24                   MR. MEISTER:  I do.

25                   THE COURT:  Now, the written plea agreement

1    indicates that it was signed by you and your client on

2    August 14 of 2020; is that correct?

3                    MR. MEISTER:  That's right.

4                    THE COURT:  Did your client sign the plea

5    agreement in your presence?

6                    MR. MEISTER:  I think we were in different

7    locations.  He sent me his signature, and I signed it.

8                    THE COURT:  All right.  Did you discuss the

9    contents of the plea agreement with your client prior to his

10   signing it?

11                   MR. MEISTER:  Thoroughly.

12                   THE COURT:  Have there been any promises,

13   representations, or guarantees made to either you or your

14   client other than what is contained in the written plea

15   agreement in exchange for your client's plea of guilty?

16                   MR. MEISTER:  No, Your Honor.

17                   THE COURT:  Other than what is contained in the

18   written plea agreement and other than a general discussion with

19   your client of the sentencing guidelines and other factors that

20   I will consider in determining his sentence, have you made any

21   indication to your client of what specific sentence the Court

22   would impose or conveyed to your client any promise of a

23   particular sentence in the event I accept his plea of guilty?

24                   MR. MEISTER:  No.

25                   THE COURT:  In your judgment, is it in your

1    client's best interest and the interest of justice for me to

2    accept his guilty plea?

3                    MR. MEISTER:  It is.

4                    THE COURT:  Do you know of any reason why the

5    Court should not accept his plea of guilty?

6                    MR. MEISTER:  I do not.

7                    THE COURT:  Do you join in the waiver of jury

8    trial and concur in the plea?

9                    MR. MEISTER:  I do.

10                   THE COURT:  I'm going to ask the prosecutor.

11   Other than what is expressly contained in the written plea

12   agreement, has the Government made any other promises,

13   representations, or guarantees either to the defendant or his

14   counsel in exchange for his plea of guilty?

15                   Mr. Jenkins, are you still with us?

16                   MR. JENKINS:  I apologize, Your Honor.  I was on

17   mute.  No, Your Honor.

18                   THE COURT:  All right.  I'm going to ask some

19   concluding questions of Mr. Goldman.

20                   Sir, are you fully satisfied with the advice and

21   representation your lawyer has provided you in this matter?

22                   THE DEFENDANT:  Yes, sir.

23                   THE COURT:  Do you feel that your attorney has

24   fully considered any defense you may have to the charge?

25                   THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Do you feel that your attorney has

2     fully advised you concerning this matter?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Do you feel you've had enough time to

5     discuss your case with your attorney?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Has anyone told you you had to answer

8     any of my questions in a particular way in order for the Court

9     to accept your plea of guilty?

10          THE DEFENDANT:  No, sir.

11          THE COURT:  Have you answered all my questions

12     this morning truthfully?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Do you feel that you understand

15     everything happening here today, the consequences to you, and

16     do you believe you're competent to make the decision to plead

17     guilty?

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  Do you understand that all that is

20     left in your case in the event I accept your plea of guilty

21     will be the imposition of sentence which may include

22     imprisonment under the federal guidelines?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Having in mind all that we discussed

25     regarding your plea of guilty, the rights you will be giving

1    up, the maximum sentence you might receive, is it still your

2    desire to enter a plea of guilty?

3                    THE DEFENDANT:  Yes, Your Honor.

4                    THE COURT:  How do you now plead to the

5    single-count Information filed on August 25th, 2020?  Guilty or

6    not guilty?

7                    THE DEFENDANT:  Guilty, Your Honor.

8                    THE COURT:  All right.  I'm going to make certain

9    findings.  If you don't understand what I say or disagree with

10   what I say, please interrupt me.

11                   The Court having questioned the defendant and his

12   counsel on his offered plea of guilty to the single-count

13   Information, the defendant and his counsel having advised the

14   Court that they have conferred concerning the offered plea of

15   guilty and all aspects of the charge against the defendant and

16   any defenses he may have, the Court having observed the

17   defendant's intelligence and demeanor and attitude while

18   answering questions, and the Court having observed that the

19   defendant does not appear to be under the influence of any

20   medicine, drug, or other substance or factor which might affect

21   his actions or judgment in any manner, the Court finds there is

22   a factual basis for the plea.

23                   The Court finds the defendant has entered his

24   plea freely and voluntarily with a full understanding of the

25   charge against him and the consequence of his plea.

1          The Court finds the defendant understands his

2     constitutional and statutory rights and wishes to waive those

3     rights.

4          Accordingly, the defendant's plea of guilty to

5     the single-count Information filed on August 25th, 2020, is

6     accepted and entered.

7          The clerk is going to give you a date for

8     sentencing, and I direct you to appear on that date and time

9     without further order of the Court.

10          Shannon, before you do that, have counsel arrived

11     at a sentencing date?

12          MR. JENKINS:  We have not predetermined one,

13     Your Honor.

14          THE COURT:  All right.  Shannon will then give

15     you a date.

16          THE CLERK:  December 14, 2020, at 8:00 a.m.

17          MR. MEISTER:  Can I take a look real fast?  Thank

18     you, Your Honor.

19          THE COURT:  All right.  Mr. Goldman, I direct you

20     to appear on that date and time without further order of the

21     Court.

22          I appreciate counsel resolving this matter.

23          Anything else from the Government?

24          MR. JENKINS:  Nothing from the Government.  Thank

25     you, Your Honor.

1          THE COURT:  Anything else from the defense?

2          MR. MEISTER:  Just a question, Your Honor.  Just

3    as we did this hearing and the initial appearance, will

4    sentencing be by video conference, or will we be in the

5    courtroom?

6          THE COURT:  Don't know.  Hopefully we will be in

7    the courtroom.

8          MR. MEISTER:  Okay.

9          THE COURT:  We are taking the reopening of the

10   First Street Courthouse on a weekly -- we're looking at it on a

11   weekly basis.  Hopefully we will be back in full business in

12   December.

13         MR. MEISTER:  Okay.

14         THE COURT:  I don't have any control.

15         MR. MEISTER:  Thank you.

16         THE COURT:  All right.  Everybody stay safe, and

17   in absence of anything else, we will close the record.

18         Thank you very much.

19         MR. MEISTER:  Thank you, Your Honor.

20         MR. JENKINS:  Thank you, Your Honor.

21         THE DEFENDANT:  Thank you.

22         (Proceedings concluded at 9:27 a.m.)

23

24

25

1                 CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5         I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

6 COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7 THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8 PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9 FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10 STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11 ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12 CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13 THE UNITED STATES.

14

15                DATED THIS  6TH  DAY OF NOVEMBER, 2020.

16

17

18               /S/ MIRANDA ALGORRI

19               MIRANDA ALGORRI, CSR NO. 12743, CRR
                 FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25