E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Criminal Division
CASSIE D. PALMER (Cal. Bar No. 268383)
SUSAN S. HAR (Cal. Bar No. 301924)
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2091/0363/3289/3819
    Facsimile: (213) 894-6436
    E-mail:    Mack.Jenkins@usdoj.gov
            Cassie.Palmer@usdoj.gov
            Susan.Har@usdoj.gov
            Brian.Faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>      v.<br><br>MORRIS ROLAND GOLDMAN,<br><br>      Defendant. | No. CR 20-369-JFW<br><br>GOVERNMENT'S SENTENCING POSITION AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K1.1; MEMORANDUM OF POINTS AND AUTHORITIES<br><br>**[PUBLIC VERSION – REDACTED]**<br><br>Hearing Date: July 12, 2024<br>Hearing Time: 8:00 a.m.<br>Location:    Courtroom of the Hon.<br>          John F. Walter |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins, Cassie D. Palmer, Susan S. Har, and Brian R. Faerstein, hereby files its sentencing position and motion for downward departure pursuant to U.S.S.G. § 5K1.1 for defendant Morris Roland Goldman.

This sentencing position and motion are based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 25, 2024                    Respectfully submitted,

                                        E. MARTIN ESTRADA
                                        United States Attorney


                                              /s/
                                        _____
                                        BRIAN R. FAERSTEIN
                                        MACK E. JENKINS
                                        CASSIE D. PALMER
                                        SUSAN S. HAR
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

1

**TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES.................................................iii

3   MEMORANDUM OF POINTS AND AUTHORITIES.................................1

4   I.    INTRODUCTION....................................................1

5   II.   DEFENDANT'S OFFENSE CONDUCT.....................................2

6         A.    Defendant Facilitates Carmel Partners' Contributions
                to the Community Support PAC in 2016 and 2017............2
7
          B.    Defendant Helps Establish the Families PAC...............4
8
          C.    Defendant Facilitates Carmel Partners' $50,000
9               Commitment to the Families PAC in Spring 2018...........4

10        D.    Defendant Facilitates Carmel Partners' Additional
                $50,000 Commitment to the Families PAC in Fall 2018 as
11              a Bribe.................................................5

12  III.  PLEA AGREEMENT..................................................7

13  IV.   THE USPO'S GUIDELINES CALCULATIONS..............................7

14        A.    Offense Level and Criminal History Category..............7

15        B.    Advisory Guidelines Range Before Departure..............10

16  V.    GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE UNDER SECTION
          5K1.1..........................................................10
17
          A.    Significance and Usefulness of Assistance...............10
18
          B.    Truthfulness, Completeness, and Reliability of
19              Information and Testimony...............................14

20        C.    Nature and Extent of Assistance.........................15

21        D.    Danger or Risk of Injury to Defendant and Family........15

22        E.    Timeliness of Assistance................................16

23  VI.   THE GOVERNMENT'S SENTENCING RECOMMENDATION.....................16

24        A.    Nature and Circumstances of the Offense.................17

25        B.    History and Characteristics of Defendant................19

26        C.    Need to Reflect Seriousness of Offense, to Promote
                Respect for the Law, and to Provide Just Punishment
27              for the Offense.........................................21

28        D.    Affording Adequate Deterrence...........................22

i

    E.   Avoidance of Unwarranted Sentencing Disparities..........24

VII.  FINE .............................................................25

VIII.  CONCLUSION .................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

<u>Gall v. United States</u>,
  552 U.S. 38 (2007) ............................................. 24

<u>McCormick v. United States</u>,
  500 U.S. 257 (1991) ......................................... 8, 9

<u>Molina-Martinez v. United States</u>,
  136 S.Ct. 1338 (2016) ........................................ 24

<u>United States v. Carpenter</u>,
  961 F.2d 824 (9th Cir. 1992) ............................... 8, 9

<u>United States v. Carty</u>,
  520 F.3d 984 (9th Cir. 2008) ................................. 17

<u>United States v. Ganim</u>,
  No. 3:01-cr-263, 2006 WL 1210984 (D. Conn. May 5, 2006) .......... 22

<u>United States v. Morgan</u>,
  635 F. App'x 423 (10th Cir. 2015) ............................ 22

<u>United States v. Rita</u>,
  551 U.S. 338 (2007) .......................................... 24

**Statutes**

18 U.S.C. § 371 .................................................. 7

18 U.S.C. § 3553(a) ......................................... passim

**Rules**

Federal Rule of Criminal Procedure 32 ............................ 8

**Sentencing Guidelines**

U.S.S.G. § 2B1.1 ................................................. 7

U.S.S.G. § 2C1.1 .............................................. 7, 9

U.S.S.G. § 2X1.1 ................................................. 7

U.S.S.G. § 3E1.1 ................................................. 7

iii

U.S.S.G. § 4C1.1 ................................................................ 7, 8

U.S.S.G. § 5B1.1 ................................................................ 16, 24

U.S.S.G. § 5C1.1 ................................................................ 24

U.S.S.G. § 5E1.2 ................................................................ 25

U.S.S.G. § 5K1.1 ................................................................ passim

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

As a lobbyist, defendant Morris Roland Goldman inhabited a unique position within the conspiracy to which he pleaded guilty.  On the one hand, defendant was a close associate of and fundraiser for City Councilmember Jose Huizar ("Huizar"), helping establish a political action committee ("PAC") through which Huizar sought to raise unlimited sums of money for his wife's campaign to succeed him. On the other, defendant represented and assisted Carmel Partners with obtaining access to and political support from Huizar for Carmel Partners' projects in Los Angeles.  Defendant wore these two hats simultaneously and became the key intermediary between Huizar and Carmel Partner's Mateo project in the downtown L.A. Arts District.

Within this influential role, defendant knew the line between legitimate political contributions and illegal bribery.  Yet when faced with the choice to either stay on the right side of it or break the law to advance his own interests, defendant chose the latter course.  Defendant conspired with and brokered a bribe between Huizar and a Carmel Partners executive, trading Carmel Partners' $50,000 commitment to the PAC for Huizar's explicit promise to vote against a potential costly appeal to the Mateo project.  In so doing, defendant demonstrated the potent impact lobbyists can have in fostering corruption, beyond the public officials and business stakeholders on either side of the balance.

Defendant's sentence must account for the corrosive consequences of his conduct to the legitimate functioning of our political system and the public's faith in fair play.  It also must deter other likeminded lobbyists and political consultants from engaging in

1

similar corrupt acts in the future.  By the same token, defendant's
sentence should reflect the redemptive decisions he made beyond his
criminal conduct, starting with his prompt acceptance of
responsibility and cooperation with the government.  Defendant
provided substantial assistance in numerous meaningful ways -- as
described in the government's motion for a seven-level downward
departure pursuant to U.S.S.G. § 5K1.1 herein -- which the government
hopes to encourage among other political operatives with information
about corrupt activities in which they are complicit.  Defendant also
has shown a commitment to breaking from his past to start a new life
and not repeat the mistakes that brought him to this sentencing.

The government concurs with the United States Probation and
Pretrial Services Office's ("USPO") Guidelines calculations as set
forth in its Presentence Investigation Report ("PSR").  However, the
government submits that the applicable post-5K1-departure Guidelines
range in this case should be 6 to 12 months in Zone B of the
Sentencing Table.  With that advisory Guidelines range and the
broader goals of sentencing in mind, the government recommends the
following sentence: (1) three years of probation, with a condition of
six months of home detention as a substitute for imprisonment; (2) a
$60,000 fine; and (3) the $100 special assessment.

## II.   DEFENDANT'S OFFENSE CONDUCT[1]

### A.   Defendant Facilitates Carmel Partners' Contributions to the Community Support PAC in 2016 and 2017

Through his business Urban Solutions, defendant began lobbying

---

[1] Unless otherwise indicated, all facts herein are drawn from
the PSR (Dkt. No. 53, ¶¶ 19-82), and the Factual Basis contained in
the parties' plea agreement (Dkt. No. 9, Attachment A).

on behalf of Carmel Partners' real estate development interests in Los Angeles in approximately 2014 or 2015.  Defendant worked closely with Executive M, an executive at Carmel Partners who focused on the firm's Los Angeles development business.  As early as August 2016, Goldman facilitated Carmel Partners obtaining Huizar's help in initiating a General Plan Amendment ("GPA") for the Mateo project during the early stages of the entitlement approval process.[2]  Huizar agreed to assist with the GPA initiation for this project located in his Council District 14 ("CD-14").

In the following months, Huizar requested that defendant solicit contributions from defendant's clients, including Carmel Partners, to a PAC called Community Support PAC.  These contributions would be made ostensibly in support of a homelessness initiative that was on the ballot in November 2016 and that Huizar supported.  Defendant relayed Huizar's request to Executive M, and Carmel Partners made a $25,000 contribution to Community Support PAC in late October 2016, which Executive M (and defendant) sought to use to get Carmel Partners' access to Huizar "to talk big picture."

Several months later, Huizar asked Goldman to solicit an additional $25,000 contribution from Carmel Partners to Community Support PAC for another homelessness initiative on the ballot in March 2017.  Goldman once again relayed the request to Executive M, and Carmel Partners once again obliged.  Following this second $25,000 contribution in March 2017, defendant received an inquiry

---

[2] The Mateo project was a mixed-use, residential/commercial real estate development project located at 520 Mateo Street in the Arts District.  Carmel Partners acquired this property for redevelopment in September 2014.  (See No. 20-CR-326-JFW, Dkt. No. 906-1 (Carmel Partners Non-Prosecution Agreement) at ECF-page 12).)

from Executive M as to whether Carmel Partners was then in "favored status" with Huizar as compared to another developer.

**B.    Defendant Helps Establish the Families PAC**

Starting in approximately Spring 2017, defendant worked closely with Huizar, George Esparza (Huizar's Special Assistant and a key member of Huizar's pay-to-play bribery scheme), and other close associates to lay the groundwork for the Families for a Better Los Angeles PAC ("Families PAC"), which was formally established later in the year.  Defendant understood that Huizar sought to create the Families PAC for the benefit of his wife's (Richelle Rios) then-unannounced candidacy for the CD-14 City Council seat, in lieu of commandeering the Community Support PAC for that purpose.

Defendant was integral in formulating the plan for the Families PAC.  The "general purpose" PAC would enable large contributions from developers but was subject to restrictions on the causes it could support (e.g., not just a single candidate) and who could control it (e.g., not a beneficiary candidate).  Given these limitations, defendant conveyed to Huizar over a series of conversations the need to have someone Huizar trusted serve as the "face" of the Families PAC so they could exert control in the long run over the PAC's expenditures.  Ultimately, defendant collaborated with Huizar to use the Families PAC to solicit contributions for Rios's candidacy from developers with pending projects in CD-14 and projects that would eventually need Huizar's approval in the Planning and Land Use Management ("PLUM") Committee and City Council.

**C.    Defendant Facilitates Carmel Partners' $50,000 Commitment to the Families PAC in Spring 2018**

In January 2018, as the Mateo project still was being considered

4

within the City Planning Department, defendant had conversations with both Executive M and Huizar about, among other things, the affordable housing requirements for the project.  While Carmel Partners was seeking a lower percentage (5%) of units to be designated for lower income residents, Huizar initially required a higher allocation (11%) of low-income units.  Defendant relayed Carmel Partners' desire to discuss this issue to Huizar, who, in turn, inquired whether Carmel Partners would be contributing to the recently formed Families PAC. Defendant cautioned Huizar not to discuss his potential official assistance and campaign contributions in the same text thread, as defendant understood conditioning the former on the latter was illegal.

Approximately two months later, at Huizar's request, defendant solicited a $50,000 contribution from Carmel Partners to the Families PAC, to be paid in two $25,000 installments.  Executive M agreed on behalf of Carmel Partners, which made the first $25,000 payment to the Families PAC two months later in June 2018.  In the interim, Executive M pushed defendant to galvanize support for the project from Huizar and the CD-14 Office while it was still in the Planning Department.  Ultimately, in June 2018, the City Planning Commission ("CPC") approved the Mateo project but with the higher affordable housing requirement (11% "Very Low Income" units) that Huizar initially supported and Carmel Partners opposed.

**D.   Defendant Facilitates Carmel Partners' Additional $50,000 Commitment to the Families PAC in Fall 2018 as a Bribe**

Later that summer, by August 2018, defendant and Executive M became concerned about a labor union issue that arose with the Mateo project.  A labor union filed an appeal with respect to the project's

5

regulatory approval as a means of seeking to leverage a union labor agreement for the project.  Executive M stressed to defendant that this issue threatened the economic viability of the Mateo project.

Defendant met with Huizar in September 2018 to relay Executive M's request that Huizar vote against the labor union appeal in the PLUM Committee.  Huizar explained to defendant that opposing the labor union likely would exact a significant political cost and put at risk losing the labor union's support for Rios's campaign for City Council.  Huizar told defendant that Carmel Partners would have to make it worthwhile to vote against the labor union -- which defendant understood to mean that Huizar expected a financial benefit from Carmel Partners in exchange for this official action.

Defendant brokered the bribe during a meeting with Executive M two days later.  Defendant conveyed Huizar's message seeking a bribe in exchange for Huizar's opposition to the labor union's appeal.  To that end, defendant and Executive M agreed that Carmel Partners would offer to commit an additional $50,000 to the Families PAC in exchange for Huizar's vote.  Later the same day, defendant met with Huizar, relayed Executive M's offer, and confirmed the arrangement.  Huizar and Executive M met privately later in September 2018 and reaffirmed the agreement, which Huizar conveyed to defendant.

Huizar delivered on his explicit promise, voting against the labor union appeal and approving the Mateo project in PLUM and City Council in October 2018.  The project was approved with affordability requirements (6% "Moderate Income" units) favorable to Carmel Partners, contrary to the recommendations of the CPC.

Notably, while the additional $50,000 commitment brought Carmel

6

1  Partner's total commitment to the Families PAC to $100,000 in 2018,

2  the second $50,000 pledge in Fall 2018 arose with and was tied

3  directly to the labor union appeal issue.  As the essential middleman

4  in the conspiracy, defendant was integral to brokering and locking in

5  the bribe commitment between Huizar and Executive M on behalf of

6  Carmel Partners.

**III. PLEA AGREEMENT**

8      Defendant signed a cooperation plea agreement with the

9  government on August 14, 2020, in which defendant agreed to waive

10  indictment and plead guilty to one count of conspiracy to engage in

11  federal program bribery and honest services mail fraud, in violation

12  of 18 U.S.C. § 371.  (Dkt. No. 9.)  Defendant █████████████

13  ██████████████████████████████████████, through his

14  plea agreement, agreed to continue in his cooperation.  Defendant

15  entered his guilty plea on September 30, 2020.  (Dkt. Nos. 29, 34.)

**IV.   THE USPO'S GUIDELINES CALCULATIONS**

17      **A.   Offense Level and Criminal History Category**

18      Consistent with the parties' plea agreement, the USPO calculated

19  defendant's total offense level as follows:

| | | |
|---|---|---|
| Base offense level: | 12 | [U.S.S.G. §§ 2X1.1(a), 2C1.1(a)(2)] |
| Bribe value > $40,000: | +6 | [U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(D)] |
| Elected official: | +4 | [U.S.S.G. § 2C1.1(b)(3)] |
| Acceptance of responsibility: | -3 | [U.S.S.G. § 3E1.1] |
| Zero-Point offender: | -2 | [U.S.S.G. § 4C1.1] |
| <u>Total offense level:</u> | <u>17</u> | |

(PSR ¶¶ 86-110.[3])   The government agrees with these offense level calculations, subject to its motion for a downward departure pursuant to U.S.S.G. § 5K1.1 discussed below.

The government nonetheless seeks to clarify one aspect of the factual basis underlying the USPO's calculation of the bribe value.[4] While the government agrees that the six-level enhancement applies because the bribe was valued between $40,000 and $95,000, the government disagrees with the PSR's finding that the operable bribe amount was $75,000, as opposed to $50,000.  (See PSR ¶¶ 94, 101(1), 101(5).)   The USPO's finding of $75,000 is based on the aggregate campaign contributions that Carmel Partners actually paid to the two PACs; namely, $50,000 to Community Support PAC in 2016 and 2017 and $25,000 to the Families PAC in June 2018.  (PSR ¶ 94.)  However, as the government informed the USPO (and consistent with the parties' plea agreement), the operable bribe amount with respect to defendant's involvement in the conspiracy should be $50,000, in consideration of the heightened standard for campaign contributions in extortion (and, by extension here, bribery) cases set forth in McCormick v. United States, 500 U.S. 257, 273 (1991), and United States v. Carpenter, 961 F.2d 824, 827 (9th Cir. 1992).

Specifically, as reflected in defendant's factual basis, the $50,000 commitment that defendant orchestrated from Carmel Partners

---

[3] The Zero-Point Offender adjustment under U.S.S.G. § 4C1.1 was not available at the time of the parties' plea agreement in 2020. The government agrees that it should apply here.

[4] The government timely notified the USPO, copying defense counsel, regarding its proposed corrections to the PSR on June 18, 2024, pursuant to Federal Rule of Criminal Procedure 32(f) and this Court's order regarding sentencing (Dkt. No. 29).  To be clear, the government does not have any objections to the USPO's Guidelines offense level calculations.

1    to the Families PAC in Fall 2018 was made in exchange for Huizar's

2    "explicit promise" to vote against the labor union appeal in the PLUM

3    Committee.  McCormick, 500 U.S. at 273.  It was only by the time

4    defendant brokered the $50,000 pledge in Fall 2018 that the evidence

5    demonstrated the requisite "clear and unambiguous" quid pro quo,

6    notwithstanding that the understanding "need not be verbally

7    explicit."  Carpenter, 961 F.2d at 827.  Based on the available

8    evidence, the earlier contributions that the PSR cites in calculating

9    the bribe amount do not tend to reflect the same degree of a clear

10   and unambiguous quid pro quo involving an explicit promise from

11   Huizar, at least with respect to defendant's involvement.  Moreover,

12   the need for the particular official act that was the object of

13   Huizar's explicit promise (in particular, his voting against the

14   labor union appeal) had not materialized prior to July 2018.  Thus,

15   as the parties agreed in the plea agreement factual basis (Dkt. No.

16   9, Attachment A, ¶ 3), the government believes defendant's

17   facilitation of the $50,000 bribe commitment in Fall 2018 constitutes

18   the appropriate bribe value for the offense level calculation.[5]

19        Given defendant has no criminal history points, the government

20   agrees that he falls into Criminal History Category I.  (PSR ¶ 115.)

---

[5] For the same reasons, the government informed the USPO that it
disagrees with the PSR's analysis regarding the U.S.S.G. § 2C1.1(b)(1)
adjustment.  (PSR ¶¶ 91-92.)  The PSR correctly found there was only
one bribe, and thus the 2-level increase for multiple bribes should
not apply.  (Id.)  However, the PSR incorrectly asserts that the
"multiple payments" that "Huizar received" (for both PACs) were "all
in exchange for Huizar's assistance with approvals on the Mateo
project," instead tethering its finding of only one bribe to the
assertion they were all part of "a single incident of bribery."
(Id.)  As the government explains above, the § 2C1.1(b)(1) upward
adjustment should not apply because, under the heightened standard
for campaign contributions and the available evidence, the earlier
PAC payments do not tend to meet the applicable standard as clearly
and unambiguously as the bribe commitment in Fall 2018.

1

### B.   Advisory Guidelines Range Before Departure

2

The USPO found that, based on a total offense level 17 and CHC

3

I, the resulting advisory Guidelines range is 24 to 30 months'

4

imprisonment.  (Id. ¶ 161.)  Based on this range, the USPO recommends

5

a below-Guidelines sentence of 18 months' imprisonment (reflecting at

6

least a two-level downward variance), with three years of supervised

7

release to follow, a fine of $60,000, and the mandatory $100 special

8

assessment.  (Dkt. No. 52 (USPO Recommendation Letter).)

9

The government believes a more lenient sentence is appropriate

10

in consideration of defendant's substantial assistance to law

11

enforcement and the goals of sentencing under 18 U.S.C. § 3553(a).

12

Accordingly, as explained further below, the government moves for a

13

downward departure of seven levels pursuant to U.S.S.G. § 5K1.1.

14

### V.   GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE UNDER SECTION 5K1.1

15

Pursuant to U.S.S.G. § 5K1.1, the government moves the Court to

16

depart downward seven levels to reflect defendant's substantial

17

assistance to law enforcement.  Section 5K1.1 lists five factors the

18

Court may consider in determining the appropriateness of a

19

substantial assistance departure, each of which is addressed below.

20

### A.   Significance and Usefulness of Assistance

21

Defendant's assistance to the government in its investigation

22

and prosecution of Huizar, Raymond Chan ("Chan"), and others involved

23

in the City Hall corruption scandal proved significant and useful in

24

several ways.

25

First, defendant was a key insider with respect to both Huizar

26

and Carmel Partners, especially in connection with the Mateo project

27

bribery scheme.

28





Avoiding the projected 8-14-week RICO trial with Huizar (as compared to the two-week trial against only Chan) saved the government and the Court substantial time and resources.

Second, defendant testified in both of Chan's trials, with his testimony helping the government obtain the across-the-board convictions against Chan in March 2024.

12

1 █████████████████████████████████████████

2 ████████████████████████████████████

3 █████████████████████████████████████████

4 ███████████████████████████████████████

5 █████████████████████████████████████

6 ██████████████████████████████████████████

7 █████████████████████████████████████████

8 ████████████████████████████████

9     ██████████████████████████████████████

10 █████████████████████████████████████████

11 ███████████████████████████████████████

12 ██████████████████████████████████████████

13 ██████████████████████████████████████████

14 █████████████████████████████████████████

15 █████████████████████████████████████████

16 ██████████████████████████████████████████

17 ██████████████████████████████████

18     Third, defendant provided additional information and assistance

19 that aided the government ████████████████████

20 ██████████████████████████████████████████

21 █████████████████████████████████████████

22 ████████████████████████████████████████

23 ██████████████████████████████████████

24 ██████████████████████████████████████████

25 ████████████████████████████████████████

26 █████████████████████████████████████████

27 ███████████████████████████

28

1   ████████████████████████████████████████████████████

2   ████████████████████████████████████████████████

3   ██████████████████████████████████████████████████████

4   ██████████████████████████████████████

5   ████████████████████████████████████████████

6      **B.    Truthfulness, Completeness, and Reliability of Information and Testimony**

7

8   █████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ██████████████████████████████████████████████████████

11  ████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ██████████████████████████████████████

15  ████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████

20  ██████████████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ██████████████████████████████████████

24  ████████████████████████████████████████████████ the

25  government believes defendant consistently provided truthful,

26  complete, and reliable information ███████████████████████

27  ████████████████████████████████████. Defendant's

28

1   statements and testimony were corroborated by numerous evidentiary

2   sources, including text messages, emails, calls intercepted pursuant

3   to court-authorized wire taps, other documentary evidence, and

4   testimony provided by other witnesses.

5         **C.   Nature and Extent of Assistance**

6         As previously explained, defendant cooperated with the

7   government in three distinct ways.

8

9

10

11   he agreed to testify

12   as requested, ultimately testifying at both of Chan's trials (the

13   government has no doubt he would have provided critical testimony

14   against Huizar as well).

15

16

17

18

19

20

21

22   Defendant fulfilled all the promises of

23   cooperation in his plea agreement as requested by the government.

24         **D.   Danger or Risk of Injury to Defendant and Family**

25         The government is not aware of any danger or risk of injury that

26   defendant or his family faced as a result of his cooperation, aside

27   from the intense media attention and significant public interest in

28

1   this high-profile case.

2       **E.   Timeliness of Assistance**

3       Defendant's cooperation was very timely. ████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████████████████████

7   ████████████████████████████████████████████

8   ████████████████████████████████████████████

9   ████████████████████████████████████████████

10       Defendant entered a plea agreement with the government in August

11   2020, after the initial indictment against Huizar was returned at the

12   end of July 2020. ████████████████████████████

13   ████████████████████████████████████████████

14             *   *   *   *   *

15       In light of the foregoing, the government submits that a seven-

16   level departure under U.S.S.G. § 5K1.1 is warranted and appropriate,

17   and hereby moves for such a departure.

18       Based on a departure of seven levels, should the Court grant the

19   government's motion, defendant's total offense level would be 10,

20   which, with CHC I, would yield an advisory Guidelines range of 6 to

21   12 months in Zone B of the Sentencing Table.

22   **VI.   THE GOVERNMENT'S SENTENCING RECOMMENDATION**

23       In consideration of the proposed post-departure advisory

24   Guidelines range of 6 to 12 months and the 18 U.S.C. § 3553(a)

25   factors, the government believes a sentence of three years'

26   probation, including a condition of six months of home detention in

27   lieu of imprisonment (consistent with U.S.S.G. § 5B1.1(a)(2)), is

28

1  sufficient, but not greater than necessary, to achieve the goals of
2  sentencing.  United States v. Carty, 520 F.3d 984, 991 (9th Cir.
3  2008).  This sentence sufficiently reflects the seriousness of
4  defendant's offense and fulfills the other sentencing objectives
5  under 18 U.S.C. § 3553(a), while also appropriately accounting for
6  defendant's substantial assistance, his remorse and commitment to
7  starting a new life, and his personal history and characteristics.

8       **A.   Nature and Circumstances of the Offense**

9       With full knowledge as to the line between permissible political
10 contributions and illegal bribery, defendant deliberately crossed it.
11 Defendant conspired with Huizar and Executive M and was uniquely
12 situated within the conspiracy to facilitate and solidify the bribe
13 arrangement in Fall 2018.

14      As Huizar's and Carmel Partners' middleman on the Mateo project,
15 defendant brokered the additional $50,000 commitment to the Families
16 PAC, in exchange for Huizar's explicit promise to vote against the
17 labor union appeal.  Defendant was fully aware of what he was doing,
18 going back-and-forth between Executive M and Huizar multiple times
19 (including three in-person meetings) in the span of two days in early
20 September 2018 to orchestrate the bribe arrangement.  Defendant
21 communicated Executive M's request that Huizar vote against the labor
22 union appeal and Huizar's counter demand that Carmel Partners make it
23 "worthwhile" (or words to that effect) to Huizar to oppose a powerful
24 political ally.  Defendant clearly understood that Huizar was
25 illegally conditioning his vote against the labor unions on a
26 financial benefit from Carmel Partners.  In fact, when meeting with
27 Executive M, <u>defendant</u> came up with the idea (which Executive M

28

1   supported) for the additional $50,000 Families PAC commitment to be

2   the "worthwhile" bribe that could buy Huizar's support.  Defendant

3   sealed the quid pro quo arrangement by meeting with Huizar later the

4   same day and securing Huizar's agreement.  Having cautioned Huizar

5   earlier in the year not to write text messages that could be

6   interpreted as conditioning an official act on a PAC contribution,

7   defendant knew the illegality of what he was doing every step of the

8   way.  And yet he persisted from one conversation to the next, helping

9   drive the corrupt bargain.

10          Comparatively speaking, defendant did not receive any money or

11   immediate benefits on either side of the PAC commitment bribe

12   transaction -- as did Huizar for his wife's campaign and Executive M

13   for side-stepping a major obstacle to the success of the Mateo

14   project.  But by playing both sides, defendant stood to gain in

15   further solidifying his professional (and lucrative) relationships

16   with both Huizar and Carmel Partners.  Defendant demonstrated to

17   Huizar, plainly and without equivocation, that he would be willing to

18   cross the line into illegal bribery and put Huizar's corrupt

19   interests above all else.  Maintaining his close relationship with

20   Huizar was critical to defendant's success as a real estate

21   development lobbyist in Los Angeles.  Defendant similarly sought to

22   demonstrate to Carmel Partners (through Executive M) that he was a

23   lobbyist who could get things done and had the key relationships at

24   City Hall to do so.  Defendant elevated these self-interests over his

25   appreciation of right from wrong, and he forged ahead.

26          Defendant also helped lay the groundwork for Huizar's

27   solicitation of bribes through political contributions by

28

collaborating with Huizar, Esparza, and others to establish the
Families PAC for Rios's candidacy.  Defendant advised Huizar on how
the PAC could be best positioned, as a general purpose PAC, to pull
in millions of dollars in contributions for Rios while still
effectively remaining under Huizar's control.[7]  Huizar would come to
use the Families PAC, in part with defendant's assistance, as a
destination for developers seeking access to Huizar and, in some
cases, as a mechanism for soliciting bribes in exchange for the
explicit promise of an official act.  The Families PAC became yet
another implement in Huizar's corruption playbook, spreading into and
infecting the foundations of the political system.  Defendant helped
set that part of Huizar's pay-to-play scheme in motion, and with
respect to the $50,000 bribe commitment in Fall 2018, guided it
through to fruition.

In sum, the nature and circumstances of defendant's involvement
in the conspiracy to commit bribery, culminating in his facilitation
of the Huizar-Executive M bribe arrangement in Fall 2018, are
undeniably very serious and warrant a meaningful sentence.

**B.    History and Characteristics of Defendant**

In addition to defendant's substantial assistance to law
enforcement as described in section V above, defendant's personal
background and his actions since accepting responsibility provide
additional mitigating circumstances relevant to sentencing.

Most notably, defendant has made a clean break from Los Angeles

---

[7] To be clear, defendant is not charged with any campaign
finance violations.  Nonetheless, as set forth in defendant's factual
basis, the formation of the Families PAC was instrumental to
defendant and Huizar's collaboration in raising money for Rios's
candidacy from developers with pending or future projects in Los
Angeles and, ultimately, the bribe that defendant brokered.

19

city politics and his past life as a lobbyist since taking
accountability for his corrupt conduct in this case.  As previously
noted, defendant accepted responsibility and cooperated promptly

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████.  Defendant
closed his lobbyist business (Urban Solutions) in 2020, moved up the
California Coast, and started a second career in the wine industry.
(PSR ¶¶ 146-50.)  In so doing, defendant walked away from an advanced
degree in public administration and a career in city government and
politics that he had built over 30 years.  (Id. ¶¶ 144, 150-51.)

Defendant has progressed through a series of wine-related jobs
over the last three-to-four years and obtained a sommelier
certification, reflecting his dedication to building a new life.
(Id. ¶¶ 145-49.)  Defendant also has volunteered with a mental health
organization in his new community.  (Id. ¶ 133.)  In turning over a
new leaf and quickly thriving, defendant has shown a willingness and
commitment to leading a productive life far removed from the world of
politics and real estate development where he broke the law.

In addition, as noted in the PSR (id. ¶ 85) and borne out in
defendant's letter to the Court in support of his sentencing position
(Dkt. No. 54-5), defendant has made clear that he "accept[s] full
responsibility for breaking the law," feels "heartbroken,"
"humiliated" and "ashamed" about his "despicable conduct," and
"deeply regrets" his "corrupt actions."  (Dkt. No. 54-5 at 2, 5, 7.)
In the government's estimation, defendant exhibited similar remorse

1    and regret for his conduct during his meetings with the government.[8]

2        Defendant appears to have the stability and support of his
3    family (his wife of over 35 years with whom he lives and his two
4    adult children) as he rebuilds his life in a productive fashion.
5    (PSR ¶¶ 127-28, 134.)  Defendant has no criminal history and no prior
6    encounters with law enforcement of any kind.  (Id. ¶¶ 112-18.)  It
7    would appear, taking his past, present, and future trajectory as a
8    whole, defendant poses little-to-no threat of recidivism.

9        Defendant's history and characteristics, and his extensive
10   cooperation as discussed above, provide significant mitigating
11   circumstances and warrant a probationary sentence with a condition of
12   home detention in lieu of imprisonment.

13       **C.**   **Need to Reflect Seriousness of Offense, to Promote Respect
14          for the Law, and to Provide Just Punishment for the Offense**

15       Notwithstanding the mitigating circumstances of defendant's
16   cooperation and background, it is important not to lose sight of the
17   corrosiveness of defendant's underlying conduct to our political
18   system and the public's trust in our governing institutions.

19       Defendant helped Huizar establish a PAC for his wife's campaign,
20   plotting with Huizar to install a loyal "face" to maintain control
21   over the PAC and steer developer contributions to it.  Defendant then
22   conspired with Huizar to extract a bribe commitment from a desperate
23   developer to that same PAC.  Public cynicism over the abundance of
24   money in politics is only further fueled by the misuse of that money
25   for patently corrupt ends.  As one court observed, "corruption has

26
27       [8] Defendant submitted numerous letters from family, friends,
     professional colleagues and mentors, and his rabbi reflecting similar
     views as to defendant's character and remorse for his actions in this
28   case.  (See generally Dkt. No. 54, Attachments.)

the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels." United States v. Ganim, No. 3:01-cr-263, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006).  Thus, "[t]he judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself." United States v. Morgan, 635 F. App'x 423, 447 (10th Cir. 2015).

To be clear, Huizar was the elected official within this conspiracy (with defendant and Executive M) and the beneficiary of nearly $2 million in benefits of numerous forms in the larger RICO conspiracy.  Huizar thus deserves significantly more blame (and punishment) than defendant for public cynicism and detachment arising out of Huizar's broader corrupt pay-to-play scheme.  But defendant was complicit in this aspect of Huizar's abuse of his official position through the Mateo project bribery scheme.  Defendant also must be held accountable for his role in breaching the public's trust and undermining respect for the law.  A sentence of three years' probation with a condition of six months' home detention as a substitute for imprisonment strikes the right balance in this case.

### D.   Affording Adequate Deterrence

For similar reasons, general deterrence is an important factor here.  Lobbyists and consultants are endemic to the world of real estate development and political fundraising in Los Angeles (and beyond).[9]  Lobbyists, as well as consultants without lobbyist

---

[9] According to the Los Angeles City Ethics Commission, as of May 6, 2024, there were 614 individual lobbyists and 117 lobbyist firms *(footnote cont'd on next page)*

registrations, aid developers and others with business in front of the City in seeking to influence City action in favor of their clients.  As the facts of this case well illustrate, lobbyists and consultants, such as defendant, inhabit a unique and often shadowy space between businesses competing for limited governmental access and approvals and the public officials with vast discretion to grant them.  Political contributions are among the prime levers lobbyists and consultants pull (on their own behalf or in advising their clients) to obtain access and political goodwill.  Ensuring that these influential operatives understand the line between legitimate contributions and illegal bribes -- and that there are real consequences for crossing it -- is paramount in rooting out corruption where it can fester in the seams.

By the same token, the government seeks to encourage proactive cooperation, especially among lobbyists and consultants who, by virtue of their sensitive positions between public officials and business interests, likely have keen insight and access to information about abuses of government and the political process. Deterring future corruption comes not only from making an example of those who have transgressed but also by encouraging those with such information to come forward.  The sentence here thus must both discourage lobbyists and consultants from crossing the line into illegal conduct as well as encourage those who do to cooperate (as defendant did here), especially in proactive fashion.  A three-year

---

with active lobbyist registrations, representing approximately 1,995 clients, in Los Angeles.  See https://ethics.lacity.gov/lobbying/lobbying-dashboard/ (last visited June 24, 2024).  These figures do not include consultants without active lobbyist registrations that nonetheless advise and assist developers and businesses in obtaining City regulatory approvals.

1  probationary sentence with a six-month term of home detention strikes
2  the right balance for this reason as well.[10]

3  **E.   Avoidance of Unwarranted Sentencing Disparities**

4  As a general matter, a within-Guidelines sentence helps avoid
5  unwarranted sentencing disparities among defendants with similar
6  criminal backgrounds who commit similar offenses.  See 18 U.S.C.
7  § 3553(a)(6).  The advisory Guidelines range provides the "starting
8  point and . . . initial benchmark" for this Court's consideration of
9  an appropriate sentence.  Molina-Martinez v. United States, 136 S.Ct.
10 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49
11 (2007)).  Although the Guidelines are not binding, they "reflect a
12 rough approximation of sentences that might achieve section 3553(a)'s
13 objectives."  United States v. Rita, 551 U.S. 338, 350 (2007).

14 The government's requested seven-level departure in this case
15 would reduce the applicable advisory Guidelines range from 24-30
16 months to 6-12 months' imprisonment within Zone B.  The Guidelines
17 provide that for offenders in Zone B, "the minimum term [of
18 imprisonment] may be satisfied by . . . a sentence of probation that
19 includes a condition . . . that substitute[s] . . . home detention
20 for imprisonment" (with one day of home detention equivalent to one
21 day of imprisonment).  U.S.S.G. §§ 5C1.1(c)(3), (e); see also U.S.S.G.
22 §§ 5B1.1(a)(2).  The government's sentencing recommendation of three
23 years' probation with six months of home detention is thus within the
24 government's requested post-departure advisory Guidelines range.  Any
25 disparity between defendant's sentence and those of offenders engaging

26

27 [10] As previously explained, affording specific deterrence does
   not appear to be necessary in this case given defendant's lack of any
   criminal history and his clean break from his past life.  Nor does
28 protecting the public from further crimes of defendant.

in similar misconduct would not be unwarranted by virtue of defendant receiving the benefit of his substantial assistance in this case.

## VII. FINE

The government concurs with the USPO that defendant has the immediate ability to pay a fine up to the statutory maximum (PSR ¶¶ 157-58), and that a $60,000 fine is an appropriate measure of additional punishment. (Dkt. No. 52 at 1.)

The Guidelines provide that "[t]he Court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." U.S.S.G. § 5E1.2(d). Probation calculated its proposed fine based on its assessment of defendant's financial condition and the advisory Guidelines fine range based on the pre-departure offense level (i.e., $10,000 to $95,000). While the government's requested post-departure offense level would yield an advisory Guidelines fine range of $4,000 to $40,000, the government nonetheless concurs with the USPO's recommendation of $60,000, fashioned in context of defendant's financial condition, as an appropriate punitive amount taken together with the government's other recommended sanctions.

## VIII.    CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence as to defendant Morris Roland Goldman: (1) three years of probation, including a condition of six months of home detention; (2) a $60,000 fine; and (3) a special assessment of $100.